MOISE, Justice.
 

 The trial court’s original judgment recognized the claims of the plaintiff, The Texas Company, and the intervenors, .George Bollinger, et al. and Odon Ducos, et al., and rejected the claims of the heirs of Pierre Lee and Charles Fillmore Lee, to a three arpent tract of land situated in the Parish of Lafourche. By permanent injunction it enjoined the defendants, Robert W. O’Meara and Thomas Guzzetta, their officers, agents and servants, etc., from in any manner entering in or upon the property involved and exploring for oil, gas or other minerals, and ordered the removal from the property any derricks, rigs or other facilities placed thereon.
 

 On rehearing the judgment was amended by adding a provision to maintain a preliminary injunction previously issued, which prohibited the defendants from entering upon the three acres for any purpose except the removal of equipment.
 

 Defendants have appealed from the original judgment and the amended judgment. The order of appeal maintained the preliminary injunction, but it granted an appeal on all other issues.
 

 We have studied the record and numerous exhibits submitted, and we are of the opinion that the trial judge’s findings of fact and conclusions of law are correct. His reasons, original judgment and amended judgment are, therefore, adopted as those of this Court. They read: ■
 

 “This is a suit by The Texas Company against (1) Robert W. O’Meara; (2) Thirty-eight heirs of Charles Fillmore Lee; (3) Thomas Guzzetta; and (4) Albert J. McDonald. Originally Two “R” Drilling Company, Inc., was also a defendant. Before- the trial on the merits this defendant was dismissed as having no further interest in the case.
 

 “Interventions were filed by the following who joined plaintiff in the assertion of its rights:
 

 “(1) Odon Ducos, Mrs. Claudine Ducos Mire, widow of Lubin Mire, Mrs. Edma Ducos Barker, wife of Warren Barker, and Frank E. Ducos;
 

 “(2) George I. Bollinger, Harvey Peltier, Donald L. Peltier, Eunice Vinet, Dolte Cheramie and Louis Navarro;
 

 “(3) Dave J. Robichaux; and
 

 “(4) Ralph L. Bollinger, Mabel Bollinger, wife of Edgar J. Toups, Georgia Bollinger, wife of Walter Boyd, Donald G. Bollinger, Belle Bollinger, wife of Otto G. Holekamp, Richard N. Bollinger, Webster M. Bollinger, Forest L. Bollinger, Violet Bollinger, wife of Sidney Knobloch, and George A. Bollinger. .
 

 
 *479
 
 “As the intervenors joined with plaintiff and at the trial concerted action was taken by the plaintiff and all the intervenors, the Court for the sake of brevity will take occasion hereinafter to refer only to the plaintiff, although a reference also to the intervenors might at the same time be appropriate.
 

 “Plaintiff asks that it be decreed the owner of the real right as mineral lessee to prospéct and explore for, and produce and .save, oil; gas and other minerals, on and from a portion of property in Lafourche Parish three arpents, more or less, front on the right descending bank of Bayou Lafourche, forming a portion of Lot 6 of Section 15, Township 21 South, Range 22 East, of the Southeastern Land District of Louisiana, West of the Mississippi River. This property is situated below Golden Meadow and just above Leeville.
 

 “The events immediately prior and leading up to the filing of this suit were the following :
 

 “On March 16, 1953, the thirty-eight Lee heirs executed an instrument purporting to grant to Thomas Guzzetta an oil, gas and mineral lease on this property. Guzzetta in turn subleased the property to Robert W. O’Meara, retaining an override for himself. The defendant, Albert J. McDonald, is likewise the owner of an override.
 

 “On or about May 27, 1953, Two “R” Drilling Company, Inc., acting under a contract with O’Meara, entered upon the land in question and proceeded with drilling operations. This Court granted a temporary restraining order, and thereafter a preliminary injunction, enjoining further drilling. The defendants applied to the Supreme Court of Louisiana for writs and a suspensive appeal, which application the Supreme Court denied.
 

 “On the merits plaintiff asked that its right as mineral lessee be recognized, that it be granted a permanent injunction against the defendant, that it be restored to possession to the extent that it may have been evicted and that defendants be required to destroy and remove from the property any work they may have constructed thereon.
 

 “The various alienations and acquisitions of the property involved in this law suit may be traced as follows:
 

 “Under date January 16, 1872, the State of Louisiana patented to Pierre Lee, Lots 2, 3, 6 and 7 of Section 15, in Township 21 South, Range 22 East, Southeastern District, along the right descending bank of Bayou Lafourche, in the Parish of Lafourche, State of Louisiana. On the same day the State patented to Pierre Lee, Lots 2, 5 and 6 of Section 10, just above Section 15, along the right descending bank of Bayou Lafourche, in the Parish of Lafourche. After the death of Pierre Lee, his widow, Mrs. Azelie Albarada Lee, and their six children, partitioned his property on May 12,
 
 1879,
 
 as
 
 follows:
 

 “1. Eulalie Lee, wife of Joachim Roger, Lot 2 of Section 15;
 

 
 *481
 

 “2.
 
 Andre Lee, Lot 3 of Section 15;
 

 “3. Charles Fillmore Lee, the upper 1% arpents of Lot 6 and all of Lot 7 of Section 15;
 

 “4. Paul Lee, a portion of Lot 2 of Section 23, and the northeast quarter of the Northeast quarter of Section 22, which property is bounded above by Lot 7, Lot 7 having been allotted to Charles Fillmore Lee as stated immediately above;
 

 “5. Azelie Albarada, widow of Pierre Lee, now wife of Jean Louis Richoux, land below that allotted to Paul Lee;
 

 “6. Louisiana Lee, land below that allotted to Miss Louisiana Lee;
 

 “The act of partition recites that the partitioners reserved certain property in Lot 6 of Section 10 to be sold to pay debts.
 

 “Prior to the partition, to-wit: On August 8, 1875, Pierre Lee had sold to Charles Fillmore Lee the five lower arpents of Lot 6 of Section 15.
 

 “The portion of the former Lee property acquired by the Bollinger family may be traced as follows:
 

 “Lot 3 of Section 15, which had been acquired by Andre Lee by the act of partition, passed into the hands of Giovanni Minnafo. Minnafo by the act dated April 27, 1881, acquired from Charles Fillmore Lee all of Lot 6 of Section 15, if we adopt plaintiff’s construction of the act of sale in question, but only the five upper arpents of Lot 6, if we adopt defendants’ construction of this act of sale.
 

 “Regardless, however, of the extent of the property thus conveyed by Charles Fillmore Lee to Minnafo, the latter sold on March 14, 1883, all of Lots 3 and 6 of Section 15 to James M. Bollinger.
 

 “The property in Lot 6 of Section 10 which had been reserved by the Lee heirs to be sold to pay debts was acquired by Joachim Roger. He sold it to James M. Bollinger on May 16, 1888, describing it as measuring 3% arpents front on Bayou Lafourche, bounded above by the lands of Augustin Ledet and below by those of Mrs. Eulalie Lee, wife of Joachim Roger, which land below was Lot 2 of Section 15 which Mrs. Roger had acquired in the Lee partition. By this same act Mrs. Roger sold Lot 2 to James M. Bollinger.
 

 “James M. Bollinger thus acquired the lower 3% arpents of Lot 6 of Section 10 and all of Lots 2, 3 and 6 of Section 15, thus consolidating his holdings for a frontage on Bayou Lafourche which is later described as 22% arpents, this being approximately the frontage as per his various acts of acquisition. This property is described throughout as being bounded above by Mrs. Augustin Ledet, which is the upper boundary in Lot 6 of Section 10 given in the acquisition by James M. Bollinger from Mrs. Eulalie Lee Roger and her husband, Joachim Roger, and below by the property of Theophile Ducos, afterwards Elie Ducos, which is the upper five arpents front of Lot 7, Section 15.
 

 
 *483
 
 “This property of James M. Bollinger was foreclosed on, the seizing creditor, Julien Lefort, acquiring an undivided one-half interest therein by the sheriff’s deed in the foreclosure proceedings and thereafter acquiring the other undivided one-half interest by a sheriff’s deed in partition proceedings with James M. Bollinger’s heirs. Thus by two separate sheriff’s deeds Julien Lefort acquired the entire extent of the 22% arpent tract. Lefort then sold to the heirs of James M. Bollinger, to-wit: George I. Bollinger, Webster M. Bollinger, Forest L. Bollinger and Violet Bollinger, the lower one-half of this property. This was on June 8, 1912. This property of the four Bollinger heirs is thereafter'described as the lower % of the 22% arpent tract, and its upper boundary 'is given as “Est of Julien Lefort”. The dividing line between the upper and lower halves lies in Lot 3 of Section 15.
 

 “In the Lovell survey and in-the procésverbal prepared by Lovell, which is in the record herein and is discussed more fully later, the property formerly belonging to the Estate of Lefort is shown as that of Mrs. J. O. Authement.- The manner in which this upper % of the 22% arpent tract passed to Mrs. Authement is shown by the judgment in the succession of Julien Le-fort and the acts of sale to Mrs. Authement, one of the heirs, by the other heirs.
 

 “The property thus acquired by the four Bollingers was sold for taxes on three occasions :
 

 “(1) May 26, 1917, to A. T. Dusenbury, being described as T56 acres, in the Tenth Ward, bounded by the Estate of Julien Le-fort and by the Estate of Elie Ducos; being the lower half of a 22 and % arpent tract’. It was redeemed under date January 30, 1918;
 

 “(2) To the State of Louisiana, September 2, 1922, with approximately the same description except that the 156 acres is referred to as ‘sea marsh’. It was redeemed from the State September 30, 1925;
 

 “(3) August 13, 1927, to Alex M. Barker, being described as ‘No. 3799-George Bollinger et als. 156 acres, bounded by Est. Julien Lefórt and Elie Ducos’. This time there was no redemption.
 

 “George I. Bollinger, the present owrie'r acquired the property as a particular legatee from the Succession of Alex Barker by judgment putting in possession dated September 17, 1945.
 

 “Under date March 12, 1948, George I. Bollinger granted to Dave J. Robichaux the oil, gas and mineral lease relied upon by the plaintiff in this case, Robichaux assigning the lease to The Texas Company under March 15, 1948.
 

 “The portion of the former Lee property acquired by the Ducos family may be traced as follows:
 

 “Theophile Ducos acquired from Charles Fillmore Lee the upper 5 arpents of Lot 7 of Section 15. This property was 'fore-
 
 *485
 
 dosed on by the Peoples’ Bank' of New Orleans and acquired by the plaintiff in that case by a sheriff’s deed dated January 21, 1888.
 

 “By an act dated June 10, 1897, the Peoples’ Bank of New Orleans sold the property to Elie Joseph Ducos.
 

 “From Elie Ducos and his wife (by Succession judgments rendered respectively October 22, 1909, and March 17, 1939), the property passed to their children, Mrs. Claudine Ducos, wife of Lubin Mire, Mrs. Edma Ducos, wife of Warren S. Barker, Odón B. Ducos, Frank E. Ducos, Blanche Ducos and Pierre Ducos.
 

 “On the respective deaths of Blanche Ducos and Pierre Ducos, their interests passed to- their brothers and sisters, with the result that in 1946 the property was owned by Odón B. Ducos, Mrs. Claudine Ducos, wife of Lubin Mire, Mrs. Edma Ducos, wife of Warren S. Barker, and Frank E. Ducos, in the undivided proportion of Vá-th each.
 

 “On September 21, 1946, the four Ducos héirs granted a mineral lease to Dave J. Róbichaux, which lease Robichaux transferred to The' Texas Company under date of April 17,1947.
 

 “Charles Fillmore Lee sold to the family of John C. Martin out of Lot 7 of Section 15, three separate parcels. These sales to the Martin Family show that the 5 arpents sold to ‘Theophile Ducos were necessarily the upper 5 arpents of Lot 7. The property sold to the minor Martin is described as being bounded above ‘by land lately sold to Th. Ducos & Bro.’, while that sold to John C. Martin is described as being bounded above by both the land sold to the minor and that sold to Mrs. Martin. This necessarily places the land sold to Mrs. Martin between that sold to the minor and that sold to John C. Martin. Be that as it may, all three sales to the Martin family necessarily cover property below that sold to Theophile Ducos,, and consequently place the Theophile Ducos property as the upper portion of Lot 7.
 

 “Charles Fillmore Lee oversold Lot 7, as the aggregate of the four sales, that is, the three sales to the Martin family and the one sale to Theophile Ducos, is 10 arpents.
 

 “As indicated above, the plaintiff has leases from both George I. Bollinger and the Ducos heirs.
 

 “At the time that Robert W. O’Meara, through the. Two ‘R’ Drilling Company, Inc., sought to act under the lease granted by the Lee heirs to Thomas Guzzetta, and by Guzzetta assigned to O’Meara, to-wit, on or about May 27, 1953, there were two producing wells of The Texas Company both located in the immediate vicinity of the site chosen by O’Meara, (a) State-Ducos Unit NO. 1 and (b) State-Bollinger Unit No. 1. The plaintiff continued in possession as mineral lessee under each of the two leases to the extent of continuing to possess and operate the two wells.
 

 
 *487
 
 “For a decision of this case, the Court is of the opinion that it is not' necessary to go any further back in the examination of the title than the tax sale to Barker in 1927. The factors involved in this conclusion are the following:
 

 “As recited above, the plaintiff, The Texas Company, is the mineral lessee under a lease granted by George I. Bollinger to Dave J. Robichaux, March 12, 1949, assigned by Robichaux to the plaintiff, and covering property described as the lower one-half of a 22% arpent tract fronting on Bayou Lafourche ‘by the depth thereto belonging, bounded ábove by lands formerly-belonging to the estate of Julien Lefort and now or formerly owned by P. C. Authement, and below by lands now or formerly belonging to the Estate of Elie Ducos, said tract being situated partly in Section 10 and partly in Section 15, Township 21 South, Range 22 East, Southeastern Land District, West of the Mississippi River.’ As pointed out above, George I. Bollinger acquired this property as the special legatee of the late Alex M. Barker, who, in turn, acquired at a tax sale August 13, 1927.
 

 “The Lee heirs claim the lower three' arpents, more or less, of this tract as property inherited by them from their ancestdr, Charles Fillmore Lee, of which neither he nor any of his heirs was ever divested.
 

 “It is the Court’s opinion that even if (1) Charles Fillmore Lee did not divest himself of the tract claimed by his heirs and (2) was not divested by the sale to and subsequent possession by James M. Bollinger and if his heirs acquired the tract by inheritance and had not been divested of title up to the time of the tax sale to Alex M. Barker in 1927, they were divested by reason of that sale. The Court thus reaches this conclusion:
 

 “The 1927 tax sale to Alex M. Barker was had as the result of nonpayment of taxes for 1926. There has been no attack made on the validity of the tax sale to Barker. As a matter of fact, there is nei-. ther allegation nor proof of prior payment, of taxes, dual assessment or possession by tax :debtors and as more than five years have elapsed since the date of the tax sale the validity of the tax sale is beyond question. The tax rolls of Lafourche Parish for the year 1926 contain the following assessment in Ward 10, which Ward is comprised of the lower portion of Lafourche Parish on both banks of Bayou Lafourche from Larose to the Gulf of Mexico:
 

 “ ‘3799 Aug. 13 Bollinger, & 3 others Geo. W 156 Est Julien Lefort Elie Ducos (Being Lower '% of 22% x 14, arpents) (CB above) (57-147) Sea Marsh B 156 acres $240.00.’ .
 

 
 *489
 
 “The tax sale of this property to Alex -M. Barker is by the following description:
 

 “ ‘No. 3799-George Bollinger, et als, 156 .acres bounded by Est. Julien Lefort and Elie Ducos’.
 

 “The Court has no difficulty in identify-, ing this property. The various documents •placed of record in these proceedings show that it is the same property leased by •George I. Bollinger to Dave J. Robichaux, which lease was by the latter assigned to ■plaintiff, The Texas Company. The Court is familiar with the mode of assessment of property in Lafourche Parish and with the conveyance records of that Parish, but even if the Court did not have this knowledge, it sufficiently appears from the record o'f these proceedings what the mode of assessment is and what the conveyance records show. The Court finds that it is readily apparent from the assessment rolls and the conveyance records in evidence that the property conveyed to Alex M. Barker by the 1927 tax sale is that tract of land fronting on Bayou Lafourche, by the depth thereto belonging, bounded above by the estate of Julien Lefort, the south line of whose property is located in Lot 3 of Section 15, and bounded below by the property of Elie Ducos, the northern- boundary of' which property is the dividing line between Lot 6 and Lot 7 of Section 15, and includes all- of the property claimed by the Lee heirs.
 

 “The tax sale to Alex 'M. Barker occurred on August 13, 1927. More than five years later, to-wit, on December 20, 1932; J. A. Lovell surveyed the property and confected a procés-verbal of survey, both the survey and the procés-verbal being of record herein. Lovell drew a boundary line between the Barker property and the Du-cos property which he placed approximately 2 arpents above the dividing line between Lot 7 and Lot 6, which boundary line would have the effect of dividing in-half the property herein in dispute, as such property was ultimately identified on the. trial on the merits, the upper one-half being allotted to Barker (now Bollinger), and. the lower one-half to the Ducos heirs. This was done by Mr. Lovell even though the. record title of the Ducos family required as a northern boundary line the dividing line-between these two lots, and the record title , of the Bollinger property required as a. southern boundary the same dividing line. between these two lots. Lovell, called as a witness, explained that he had not regarded lot lines in fixing this boundary but had surveyed according to ‘the way it . (the property) was sold’. This method of . procedure can be readily understood when, consideration is given to the fact that Charles Fillmore Lee oversold. Lot 7 and that, therefore, in order to give the property • owners in that lot the appropriate frontages provided for by their respective titles, it was necessary for him to place the Elie Ducos ' northern boundary outside, and to the north, of Lot 7. ...
 

 “The record indicates a certain amount of acceptance' by the landowners in question
 
 *491
 
 of the boundary line thus established by Lovell but indicates far less than that which would be sufficient to effect a transfer of title from Bollinger to the Ducos family of the lower 2 arpent tract as well as less than that which would have been necessary to serve as a basis for the commencement of ten years acquisitive prescription based on possession by the Ducos family.
 

 “Plaintiff has pleaded in the alternative that its rights as mineral lessee (1) are derived from the Bollinger lease; (2) in the alternative from the Ducos lease; (3) in the alternative from both leases. The Court regards this pleading as proper in view of the uncertainty created by the Lovell survey and the extent of the acceptance thereof by the landowners in question. Lovell’s procés-verbal recites acts that could well have accomplished the establishment of legally binding boundary lines as between Bollinger and the Ducos heirs or at any rate a situation where a ten year period of prescription might have begun to run in favor of the Ducos heirs as after the date of the Lovell survey the Du-cos heirs performed acts of possession up to the Lovell iine 2 arpents above the line of their record title.
 

 “Therefore, if the title which had vested in Alex Barker by reason of the tax sale and thereafter had become vested in George I. Bollinger extending down to the northern boundary line of Lot 7 had been divested in favor of the Ducos heirs by the Lovell survey and what transpired thereafter, the plaintiff’s rights as mineral lessee would have been derived from the Ducos lease insofar as rights from the northern boundary line of Lot 7 up to the Lovell line 2 arpents above the northern boundary line of Lot 7 were concerned.
 

 “In the alternative, if the vested title of George I. Bollinger to the 2 arpent tract in question was not divested in favor of the Ducos heirs following the 1932 Lovell survey the plaintiff’s rights as mineral lessee as far south as the northern boundary line of. Lot 7 were derived from the Bollinger lease.
 

 “Plaintiff pleaded these two contingencies and results in the alternative.
 

 “And plaintiff also pleaded in the alternative that its rights were derived from both leases in view of the fact that the Lee heirs appeared to be claiming more than the 2 arpent tract marked by the Lovell survey and, therefore, if the Ducos heirs had acquired title up to the Lovell survey line, Bollinger retaining title north of that line, then plaintiff’s rights as mineral lessee would have been derived from both the Ducos and the Bollinger leases.
 

 “The Court, therefore, regards plaintiff’s pleading of these three alternatives as proper. Such pleading was necessitated, not by any doubt as to the effect of the 1927 tax sale as contended for by defendants, but entirely due to what transpired more than five years after, the 1927 tax sale to Barker.
 

 
 *493
 
 “In view of the vigor with which defendants have asserted the validity of the title claimed by them, based on the contention that their ancestor, Charles Fillmore Lee, never divested himself, and was never divested, of title, and as the record is made up largely of testimony of witnesses regarding the possession of the property in question, the Court deems it appropriate to review this phase of the case and to state its conclusions with regard thereto.
 

 “The testimony of plaintiff’s witnesses clearly established that James M. Bollinger actually possessed all of Lot 6. Eleven witnesses testified to various acts of possession over Lot 6 by James M. Bollinger and his successors in title, including the building of a rather substantial house, ‘a big white house’, according to one witness, in which the Bollinger family lived for ten or twelve years, the building of enclosures or fences and a boat shed, the keeping of cows, oxen and chicken, and the cultivation of oranges, rice and a small garden. James M. Bollinger and his successors, when they were absent from the property, left a caretaker on the property and leased it to a number of men for trapping purposes. Furthermore, the Bollingers have put the property up for assessment and paid taxes on it for 70 years, except for the years 1923 and 1924. That James M. Bollinger possessed all of Lot 6, including the lower 3% arpents of that lot in dispute, was shown by the testimony of Mrs. Anatole Terrebonne, whose father and family lived in a house. on part of the land now in dispute, after being ‘put on’ the land by Bollinger to care for an oyster bed for him. Some of plaintiff’s witnesses were advanced in' age and a considerable period of time had elapsed since many of the events testified to transpired. Under the circumstances and after weighing the relative credibility and importance of the testimony adduced at the' trial by the several parties, the Coúrt is of the opinion that plaintiff’s' evidence on the' question of possession of lot- 6 by the Bol lingers was clear and convincing.
 

 “Even if it were not true tha>. Charles Fillmore Lee conveyed record title to all of lot 6 to Giovanni Minnafo, James M. Bollinger shortly thereafter received from Minnafo a deed translative of title to all of lot 6. The boundaries of the property conveyed in the sale by Minnafo to Bollinger were given as ‘bounded above by land of Mrs. Eulalie Lee and below, by that of Th. Ducos & Bro.’, which description necessarily included all of Lots 3 and 6. The land belonging to Mrs; Eulalie Lee was lot 2, while the land of Th. Ducos and Bros, was the upper portion of lot 7. Lot 3 lies directly below lot 2 (Mrs. Lee) and above lot 6, while lot 6 lies directly above Lot 7 (Th. Ducos & Bro.) and below Lot 3. The Minnafo-Bollinger deed ‘reasonably identified’ Lots 3 and 6'as the property conveyed, under the doctrine, of Snelling v. Adair, 1941, 196 La. 624, 199 So. 782, and cases therein cited, since the boundaries of the tract conveyed are actually I set out in
 
 *495
 
 the description contained in the deed. See Art. 854, LSA-Civil Code; Fitzgerald v. Hyland, 1942, 199 La. 381, 6 So.2d 321; Egle v. Constantin, 1941, 198 La. 899, 5 So.2d 281; Saulet v. Trepagnier, 1842, 2 Rob. 357. Thus, James M. Bollinger acquired just title to all of Lots 3 and 6, which, coupled with 10 years’ good faith possession of lot 6, gave Bollinger prescriptive ownership thereof, which ownership by a valid and unbroken chain has now vested in George I. Bollinger.
 

 “Since there was no defect in the Minnafo title apparent on the face of the Minnafo-Bollinger deed, whether or not the acquisition data contained in the deed was entirely accurate is not important. Faulty acquisition data cannot detract from a description in a deed sufficient on its face, and mere reference to an act of acquisition contained in the description of the property is not notice to the purchaser of a defect in the vendor’s title. Everett v. Clayton, 1947, 211 La. 211, 29 So.2d 769; Keller v. Summers, 1939, 192 La. 103, 187 So. 69; Mendelsohn v. Armstrong, 1900, 52 La. Ann. 1300, 27 So. 735; Land Development Co. of Louisiana v. Schulz, 1929, 169 La. 1, 124 So. 125; Nugent v. Urania Lumber Co., 2 Cir., 1931, 16 La.App. 73, 133 So. 420.
 

 “The Court holds that James M. Bollinger received a deed on its face translative of title to title to Lot 6, and since he actually and in good faith possessed all of lot 6 for a period of more than ten years, he acquired valid prescriptive title thereto, which ownership by a valid and unbroken chain has now vested in George I. Bollinger.
 

 “Defendants argued that the Lee family never divested themselves of title to the lower 3% arpents of lot 6, and, therefore, they ask, can Bollinger’s possession of the upper part of lot 6 divest the Lees of title to the lower part thereof, which title remained in the Lees ?
 

 “Even if it is assumed, for defendants’ benefit, that James M. Bollinger never actually possessed the lower portion of lot 6 and that the Lees never divested themselves of title to all of lot 6, the above argument can gain defendants nothing, for an affirmative answer to defendants’ question is provided by the Louisiana jurisprudence, in the rule of Leader Realty Co. v. Taylor, 1920, 147 La. 256, 84 So. 648, that a party’s possession of one of two contiguous tracts, both of which were transferred to him by the same deed, gives him constructive possession of both tracts. Defendants’ argument runs afoul, particularly, of the case of Smith v. Southern Kraft Corp., 1943, 202 La. 1019, 13 So.2d 335, 340 the facts of which are particularly pertinent:
 

 “In 1903 Standard Lumber Company sold a large tract of land to P. A. Smith. In 1904 Smith conveyed all of this tract, except a certain 20 acres, to other parties. In 1906 Standard Lumber Company sold land, including this 20 acre tract previously sold, to Smith, to Louisiana Central Lum
 
 *497
 
 her Company. In 1926 Louisiana Central Lumber Company sold- the same 20 acre tract to other parties, which in turn conveyed the 20 acre tract, along with adjacent lands, to Southern Kraft Corporation. In 1943 the heirs of P. A. Smith brought suit against Southern Kraft Corporation, to be declared owners of the said .20 acre tract. It was held by the Louisiana Supreme Court that defendant had acquired a 10 year prescriptive title to the tract. Plaintiff argued that defendant could not have acquired prescriptive title to the 20 acre tract because it had never actually possessed it, except for paying taxes thereon. However, the Court found that Louisiana Central Lumber Company had actually possessed lands adjacent to the 20 acre tract acquired by it along with the 20 acre tract, and concluded:
 

 “ ‘It is well settled in this state that where contiguous lands, constituting in effect one tract, are acquired under the same title, the actual possession of a part thereof is equivalent to the possession of all the property within the limits described in the deed. Civil Code, Articles 3437 and 3498; Leonard v. Garrett, 128 La. 535, 54 So. 984; Leader Realty Co. v. Taylor, 147 La. 256, 84 So. 648; Tremont Lumber Co. v. Powers & Critchett Lumber Co., 173 La. 937, 139 So. 12; Jackson v. Bouanchaud, 178 La. 26, 150 So. 567; Feazel v. Peek, 189 La. 61, 179 So. 35.
 

 “ ‘Certainly the Louisiana Central Lumber Company had actual physical possession, commencing in 1916, of that portion of the mentioned 260 acre tract on which its tram roads were maintained and trains operated. This being true, and by reason of the stated doctrine of law, it must be said that such company also had possession of the disputed 20 acres that was a contiguous part of the larger tract.’
 

 “After so holding, the Court, apparently to bolster its decision, went on to find that Louisiana Central Lumber Company had actually performed acts of possession on the 20 acre tract, but its decision wag clearly based upon the aforementioned rule of Leader Realty Co. v. Taylor. The quoted part of the decision represents the holding in the Smith case, and completely answers defendants’ argument that possession by James M. Bollinger of part of lot 6 with title to the whole thereof did not in this case amount to possession of the whole.
 

 “Defendants further argued that, since the Lees once were in possession of the tract in dispute, and never divested themselves of title thereto, their ancient possession of the lower 3% arpents of lot 6 is presumed to have continued some 70 years, until the present date. Since it was proven on the trial of this case that James M. Bollinger, with title to all of Lot 6, actually possessed the whole lot, including the
 
 *499
 
 tract in dispute, any presumption of continued possession in the Lees disappears. When- James M. Bollinger actually possessed Lot 6, any constructive Lee possession of part thereof ceased. Whatever was the nature of the Lees’ possession prior to the Lee-Minnafo and Minnafo-Bollinger transfers, Bollinger’s possession after that time was actual, continuous and uninterrupted, until the commencement of drilling operations, of defendant O’Meara. .
 

 “Furthermore, it must be pointed out that, not once during the 70 years between 1882 and 1952, did any member of the Lee family perform any act which would indicate the' slightest intention to possess any part of Lot 6. ' In fact, certain factors indicate clearly that the Lees did
 
 not
 
 intend to possess the land they n'ow claim. None of the family paid taxes on the property during this 70 year period, nor were taxes on lot 6 or any párt'thefeof assessed to any of them during that" time. Furthermore, in the judgments'of possession in “Succession of Joseph Lee’ (Number 3634, 17th Judicial District Court) and ‘Succession of Mrs. Orestile Dantin, Jr. nee Marie Lee’ (Number 3077, 17th Judicial District Court) no mention was made of the ‘property in dispute’ as belonging in any part to the heirs, although in each of the two successions other immovable property was specifically described. The nonpayment of taxes and the' noninclusion of the land in dispute in the aforementioned successions show an intention not to possess any part of Lot 6 which is stronger than any mere presumed intention otherwise. Of interest in this regard is the recent case of Collins v. Sun Oil Co., 1953, 223 La. 1094, 68 So.2d 184, 187 in which the Supreme Court stated:
 

 “ ‘* * * At no time did Dr. Collins ever indicate any interest in the property. He paid no taxes on it and it was not listed in his original succession proceedings. It was only listed by supplemental proceedings a short time before this suit was filed. The trial court was of the opinion that the parties themselves had placed a construction on the deeds to the effect that Dr. Collins had intended to convey the entire property to the V. S. & P. R. R. right-of-way. The trial judge took the position that Dr. Collins acquiesced in this construction because he lived in close proximity to the property for a period of twenty years without indicating any interest in the property and without asserting any claim of ownership to it. * * * ’
 

 “Defendants in this suit, like Dr. Collins, are now claiming to have an interest which heretofore they never indicated or manifested. Any intention which the Lees
 
 now
 
 have in connection with the property in dispute was conceived rather suddenly, a full 70 years after they had clearly given up any interest in Lot 6. Therefore, the role of the indignant landowner wrongfully dispossessed does not become them.
 

 
 *501
 
 “Plaintiff has contended that by the act of sale from Charles Fillmore Lee to Giovanni Minnafo on April 27, 1881, Lee divested himself of all of Lot 6 of Section 15. The act of sale contains the following description of the property conveyed:
 

 “ ‘A
 
 certain tract of land, * * *, measuring five (5) arpents more or less front on said Bayou, by the depth of the upper portion of Lot No. (6) Six * * *, which composes this tract, bounded above by land of said Giovanni Minnafo and below by a tract belonging to the vendor part of which said vendor has lately sold to Theophile Ducos, * * *, said tract herein described, acquired by the vendor by virtue of Act of Partition between the heirs of the late Pierre Lee, passed on the 17th May 1879.’
 

 “In the original of the act of sale the word ‘seven’ and the figure ‘(7)’ are changed to ‘five’ and ‘(5)’, respectively, and in the margin of the act there is a notation that this change has been made and approved. The Court does not attach any importance to this change as there is no inference to be drawn therefrom except that which would be a matter of surmise. It is most important, however, to note that whereas this change in the extent of the frontage of the property was made there was no change made in the statement of boundaries. This conveys all of the land from ‘land of said Giovanni Minnafo’, that is, Lot 3, on the north, to ‘a tract belonging to the vendor part of which said vendor has lately sold to Theophile Ducos’, that is, Lot 7, on the South. The Court finds that plaintiff’s contention in this respect is correct.
 

 “It appears to the Court that there is no ambiguity in the act of sale as to the extent of the property conveyed despite the fact that the act describes the property as having a frontage of only five arpents whereas the frontage according to Lee’s record title was 6% arpents, and according to actual measurement was approximately 8% arpents. The designation of northern and southern boundaries served to convey to Minnafo all of the land between these two boundaries. It was a sale per aversionem.
 

 “It is significant that this same reasoning is used by defendants themselves in concluding that Lee acquired all of Lot 6. As stated above, Lot 6 actually measures 8% arpents front on Bayou Lafourche. In 1875 Lee acquired the lower 5 arpents of Lot 6 from his father, 3% arpents, therefore, being left in Lot 6. After his father’s death, Lee acquired, in 1879, by virtue of the act of partition between the Lee heirs, ‘one and seven eighths of an arpent’. While actually the remainder of Lot 6, after the sale of the lower 5 arpents in 1875, consisted of 3% arpents front on Bayou Lafourche, nevertheless, the transfer to Charles Fillmore Lee in the act of partition conveyed to him the land between the boundaries, ‘lands hereinabove allotted to
 
 *503
 
 Andre Lee’, (Lot 3), on the north, and ‘the •balance of said lot No. Six (6) purchased on the 6th day of August, 1875, by the said •Charles Fillmore Lee from his late father, Pierre Lee’, on the south. Thus, while the act of. partition purported to convey only 1% arpents, nevertheless, the entire strip of 3% arpents, or approximately twice as much, was conveyed to Lee, because the act of partition transferred to him all of the land between the two designated boundaries.
 

 “The application of this same reasoning leads the Court • to the conclusion that Charles Fillmore Lee conveyed to Giovanni Minnafo by the act of sale of April 27, 1881, the entire extent of Lot 6 amounting to 8% arpents, although the act of sale purports to transfer only 5 arpents.
 

 “Even if there were ambiguity in the act of sale by Charles Fillmore Lee to Minnafo, the accepted canons of construction to be applied in ascertaining the true meaning of-an ambiguous act of sale would resolve any doubt in favor of the construction that the entire extent of Lot 6 was conveyed:
 

 “(1) In the first place the construction of the language must be in favor of 'the vendee and against the vendor as to the extent of the property conveyed.
 

 “(2) The intention of the parties may be gathered from their acts as follows :
 

 “(a) Lee’s intention to convey all of Lot 6 is indicated by the fact that the property was immediately taken off of the assessment rolls and Lee paid no taxes thereafter;
 

 “(b) The judgments placing in possession in two intervening Lee successions, introduced in evidence by defendants, specifically describe certain immovable property-but do not contain any mention of property-in Lot 6 of Section 15 ;
 

 “(c) Minnafo’s intention to purchase all of Lot 6 is conclusively indicated by the fact that within two years after his acquisition he transferred by act of sale all of” Lot 6 to James M. Bollinger.
 

 “In this connection, the excerpt from Collins v. Sun Oil Co., 1953, 223 La. 1094, 68 So.2d 184, 187, hereinabove quoted, should’ again be noted. In the Collins case the Court remarked upon the significance of the fact that ‘At no time did Dr. Collins, ever indicate an)"- interest in the property. He paid no taxes on it and it was not listed' in his original succession proceedings. It. 'was
 
 only
 
 listed by supplemental proceedings short time before this suit was filed.’’ Just as in the case of Dr. Collins, Charles Fillmore Lee and the Lee heirs under similar circumstances acquiesced in the construction of the deed to Minnafo that all of Lot 6 had been conveyed to him.
 

 “On the point of the contention of defendant Robert W. O’Meara that he went on the property in good faith, the Court’s-conclusion is that, Mr. O’Meara having-gone on the property in question on or about.
 
 *505
 
 May 27, 1953, with a written title opinion from his attorneys dated May 18, 1953, to the effect that the title of his lessors was ‘at best, questionable’, he went on the property without reliance upon the ‘advice of counsel’ and consequently not in good faith.
 

 “For the above and foregoing reasons:
 

 “It is ordered, adjudged and decreed that there be judgment in favor of plaintiff, The Texas Company, and against the defendants, Robert W. O’Meara, Thomas Guzzetta, Albert McDonald, and Francis Dan-tin Terrebonne, Eva Dantin, Randolph A. Dantin, Evelina Lee Lee, Bridget Lee Lee, Josephine Lee Griffin, Esperance Lee Serigny, Eva Dantin Hebert, G. J. Dantin, Zoe Dantin Hebert, Gervaise Dantin Ledet, Doretta Dantin Duhon, Enessia Lee Terrebonne, Angel Dantin Dupre, Antoinette Dantin Jeanfreau, Eva Dantin Terrebonne, Clemence Dantin Stout, Antoinette Dantin Boudreaux, Mancy Dantin, Louis Dantin, Paul P. Lee, Harris J. Lee, Theresia Dantin Lee, Mary Lee Mobley, Juline Lee Serigny, Alcide J. Dantin, Thomas J. Dantin, Jack Dantin, Joseph Gillis Lee, Edward J. Giroir, Dumiel R. Dantin, Raoul Dantin, Dair Dantin, Oris Lee, Dorothy Lee Cheramie, Elisa M. Dantin, Lorida Lee Pitre, and Charles V. Lee, decreeing The Texas Company to be the owner of the real right as mineral lessee, to prospect and explore for, and produce and save, oil, gas and other minerals on and from the following described property, to-wit:
 

 “A certain tract of land situated in the southern portion of Lot 6 of Section 15, Township 21 South, Range 22 East of the Southeastern Land District of Louisiana, West of the Mississippi River, on the right descending bank of Bayou Lafourche at about 65 miles below the Town of Thibodaux and measuring three (3) arpents, more or less, front on Bayou Lafourche by the depth of the lower or southern portion of the said Lot 6 of Section 15; the lower line of said property being the southern line of the aforesaid Lot 6 of Section 15.
 

 “It is further ordered, adjudged and decreed that a permanent injunction issue enjoining the defendants, Robert W. O’Meara, Thomas Guzzetta, their officers, agents, servants, employees and attorneys, and all persons acting under their authority or .control, from in any manner entering in or upon the property described above, prospecting and exploring thereon for oil, gas or other minerals, and that they be ordered to remove from said property, any derricks, rigs, or other facilities placed thereon by them.
 

 “It is further ordered, adjudged and decreed that, in accordance with the findings as set forth in the body of this opinion, the alternative claim of Robert W. O’Meara for reimbursement of costs of drilling operations on the land in question, be and it is hereby rejected.
 

 “It is further ordered, adjudged and decreed that there be judgment herein in fa
 
 *507
 
 vor of intervenor, George I.'Bollinger, and against all of the defendants, recognizing said intervenor to he the true and lawful owner of the property last above described.
 

 “It is further ordered, adjudged and decreed that there be judgment in favor of intervenors, Odon Ducos, Mrs. Claudine Ducos Mire, widow of Lubin Mire, Mrs. Edma Ducos Barker, wife of Warren Barker, Frank E. Ducos, Ralph L. Bollinger, Mabel Bollinger, wife of Edgar J. Toups, Georgia Bollinger, wife of Walter Boyd, Donald G. Bollinger, Belle Bollinger, wife of Otto G. Holekamp, Richard N. Bollinger, Webster M. Bollinger, Forest L. Bollinger, Violet Bollinger, wife of Sidney Knobloch, George A. Bollinger, Harvey Peltier, Donald L. Peltier, Eunice Vinet, Dolte Cheramie, Louis E. Navarro, and Dave J. Robichaux, and against all of the defendants, recognizing said intervenors to be the true and lawful owners of the mineral and/or royalty or overriding royalty interest in the property last above described in the proportions as set forth in the instruments filed in the record of these proceedings.
 

 “It is further ordered, adjudged and decreed that all costs of these proceedings be paid by the defendants.”
 

 The amended judgment of the trial court reads as follows:
 

 “Motion for a rehearing by plaintiff, The Texas Company, on the question of retaining in full force and effect the preliminary injunction heretofore issued- herein having been argued and submitted to the Court and the Court considering the pleadings, the evidence and the law and for the oral reasons assigned this day,
 

 “It is ordered, adjudged and decreed that the second paragraph of the decree in the judgment herein rendered on the 14th day of May, 1954, in favor of plaintiff, The Texas Company, and against the defendants, Robert W. O’Meara, Thomas Guzzetta, Albert McDonald, and Francis Dantin Terrebonne, Eva Dantin, Randolph A. Dantin, Evelina Lee Lee, Bridget Lee Lee, Josephine Lee Griffin, Esperance Lee Serigny, Eva Dantin Hebert, G. J. Dantin, Zoe Dantin Hebert, Gervaise Dantin Ledet, Doretta Dantin Duhon, Enessia Lee Terrebonne, Angel Dantin Dupre, Antoinette Dantin Jeanfreau, Eva Dantin Terrebonne, Clemence Dantin Stout, Antoinette Dantin Boudreaux, Mancy Dantin, Louis Dantin, Paul P. Lee, Harris J. Lee, Theresia Dantin Lee, Mary Lee Mobley, Juline Lee Serigny, Alcide J. Dantin, Thomas J. Dantin, Jack Dantin, Joseph Gillis Lee, Edward J. Giroir, Dumiel R. Dantin, Raoul Dantin, Dair Dan-tin, Oris Lee, Dorothy Lee Cheramie, Elisa M. Dantin, Lorida Lee Pitre, and Charles V. Lee, be and it is hereby amended by adding thereto, after the words ‘or other facilities placed thereon by them;’ the following proviso :
 

 “ ‘Provided, however, that the preliminary injunction heretofore issued herein shall not be vacated or rescinded hereby, nor shall its .operation be suspended hereby, but, on the contrary,
 
 *509
 
 said preliminary injunction shall remain in full force and effect.’
 

 “In all other respects the judgment to remain in full force and effect as originally rendered."
 

 For the reasons assigned, the original judgment and the amended judgment of the district court are affirmed.