268 So.2d 274 (1972)
BOARD OF COMMISSIONERS FOR the LAFOURCHE BASIN LEVEE DISTRICT
v.
Dr. William J. ELMER et al.
No. 4501.
Court of Appeal of Louisiana, Fourth Circuit.
March 21, 1972.
On Rehearing October 17, 1972.
Writ Refused November 21, 1972.
*276 James O. Manning, New Orleans, for plaintiffs-appellants.
Harold L. Molaison, Gretna, Duke & Porterie, Louis B. Porterie, W. Eric Lundin, III, New Orleans, for appellee.
Before LEMMON, STOULIG and BARNETTE, JJ.
LEMMON, Judge.
The Board of Commissioners of the Lafourche Basin Levee District has appealed from a judgment recognizing Dr. William J. Elmer as owner of certain immovable property in Jefferson Parish.
This action began when the Board filed a petition seeking to annul a 1952 tax sale to Dr. Elmer of Sections 24 and 25, Township 22 South, Range 23 East, containing approximately 553 acres, and further seeking to annul the judgment confirming the tax title in a subsequent suit by Dr. Elmer. The petition alleged that the tax sale was null because the property at the time of the sale was in the name of the State of Louisiana and not subject to State or Parish Taxes. The Sheriff and Assessor of Jefferson Parish were also made parties to the proceedings.
Dr. Elmer answered and filed a reconventional demand asserting ownership of the subject property by virtue of a 1949 act of sale from the Zodiac Corporation. He alleged actual and continuous corporeal possession since 1949 and specifically pleaded acquisitive prescription of ten years by possession in good faith under a deed translative of title.
After a trial on the merits, the district court annulled the 1952 tax sale and specifically found that the Board had established a complete record title to the property. However, the court granted judgment in favor of Dr. Elmer on his reconventional demand and recognized him as owner of the property by virtue of acquisitive prescription.
The Board appealed suspensively.
Dr. Elmer neither appealed nor answered the Board's appeal, and the judgment declaring the 1952 tax sale a nullity is now final.
The two sections were selected by the State in 1850 under the provisions of the Swampland Act and was subsequently transferred to the Board by act dated May *277 22, 1939. However, although recorded in Lafourche Parish in due course, the transfer was not registered in Jefferson Parish until May 12, 1952.
Dr. Elmer claims ownership of the two sections by virtue on a non-warranty deed from the Zodiac Corporation on October 27, 1949, in which he purchased several properties, Parcel No. 7 containing a total of approximately 1,210 acres described as:
"The entire area of land bounded on the North by Bayou Thunder, Bayou Fort Blanc and the Perrillat Lands; on the West by the Parish Line of Lafourche, Perrillat Lands, and on the East by Section Fifteen, on the South by Bay Caminada and/or the Gulf of Mexico."
A map of the general vicinity of Grand Isle and Cheniere Caminada was included as an exhibit in the record, and the portion of that exhibit reproduced below shows the perimeter of the property claimed by Dr. Elmer with a heavy dashed line and the two disputed sections as shaded:

*278 The property description in the deed then continues and specifically enumerates the sections and the acreage contained in each. The two disputed sections are not enumerated in the description, although they are within the boundaries of the general perimeter description.
Dr. Elmer had the property surveyed prior to the act of sale, and immediately after the sale he and the real estate agent posted the land with signs along Bayou Thunder (the northern and western boundary).
Shortly thereafter Dr. Elmer built a road from the highway (indicated by us on the map) to the Gulf of Mexico, and he then built a camp at the Gulf. Another camp was built on the Gulf on a portion of ground sold by Dr. Elmer.
He also subdivided a portion of ground between the Highway and Bayou Thunder in 1951 and sold 17 lots in a short period of time. He has presently sold approximately 100 lots.
In 1952 Dr. Elmer constructed an airstrip on the property, which has been used consistently until the time of trial. Since 1958 he has leased to the United States of America for $1,500.00 per year a parcel of land on which a homing tower was constructed to direct aircraft into New Orleans. In 1962 he granted a servitude in favor of Gulf Oil Company, who paid him approximately $11,000.00 for the servitude and immediately constructed a pipeline.
Dr. Elmer has also granted another pipeline servitude and presently leases land to the Town of Grand Isle for $300.00 per year for use as a garbage dump.
All of the above improvements, sales, leases and servitudes involve land within the perimeter description of the 1949 sale, but outside of the disputed area, except for a small portion of the subdivision and the garbage dump. Additionally, there are two or three campsites leased by Dr. Elmer within the disputed area where the highway crosses Bayou Thunder.

PRESCRIPTION
Acquisitive prescription is a means by which property is acquired through possession over a fixed period of time. A possessor who acquires immovable property in good faith and by just title prescribes for that property in ten years. C.C. arts. 3474, 3478. Furthermore, C.C. art. 3479 requires that four conditions must concur:
"1. Good faith on the part of the possessor.
2. A title which shall be legal, and sufficient to transfer the property.
3. Possession during the time required by law, which possession must be accompanied by the incidents hereafter required.
4. And finally an object which may be acquired by prescription."
In reverse order, we discuss these conditions and the applicable facts of the present case.
An Object Which May Be Acquired by Prescription
The thing which is the object of prescription must be susceptible by its nature of alienation, and alienation of the thing must not be prohibited by law. C.C. art. 3497.
The Board contends that at the time of Dr. Elmer's acquisition, title to the property was in the State of Louisiana, and the land was not legally susceptible of alienation or of acquisition by prescription. There is a difference between capacity of being alienated and capacity of being prescribed. The land, being immovable property, was by its nature susceptible of alienation. The issue in this case is whether the land was susceptible of prescription. Stated otherwise, was either its alienation or acquisition by prescription prohibited by law?
*279 The following chronology is helpful in this discussion:
1938 Passage of Act 76, providing that prescription shall not run against Levee Boards
5-23-39 Patent from State to Board
1944 Passage of Act 247, repealing Act 76 of 1938
10-27-49 Act of sale from Zodiac Corporation to Dr. Elmer
5-12-52 Recordation in Jefferson Parish of patent from State to Board
1964 Passage of Act 408 (R.S. 38:295), providing that prescription by which the ownership of property is acquired shall not run against Levee Boards.
Dr. Elmer points out that even if we accept the position most favorable to the Board (that title remained in the State until May 12, 1952, when the patent was recorded in Jefferson Parish),[1] he possessed the property from 1952 through 1964, a period of more than ten years, during which time prescription could legally run against Levee Boards. From 1944 until the passage of Act 408 of 1964, there was no statutory prohibition to the running of prescription against Levee Boards.
Prescription runs against all persons not included in some exception established by law. C.C. art. 3521. An exception is established for the State of Louisiana by Const. Art. 19, § 16, which provides that prescription shall not run against the State in any civil matter.
However, it has been held that this constitutional provision does not apply to Levee Boards on the theory that they are agencies of the State and not the State itself.[2] Furthermore, the running of acquisitive prescription against Levee Boards has been held not to be barred by Const. Art. 19, § 16.[3]
Although at the time of Dr. Elmer's acquisition in 1949 acquisitive prescription could not run against the property since title was in the State, prescription began to accrue when title was passed to the Board in 1952. We therefore conclude that during the ten years between May 12, 1952 and May 12, 1962 (and until Act 408 of 1964), the land in dispute was susceptible of being acquired by prescription.
Possession for Ten Years
The possession necessary for acquisitive prescription must be continuous and uninterrupted, peaceable, public and unequivocal. C.C. art. 3487. While the law presumes the possessor to have possessed as owner (C.C. art. 3488), the record is abundantly clear that everyone to whom Elmer leased, sold or granted servitudes affecting portions of the property considered him to be the owner and that he in fact possessed as such.
As to continuous and uninterrupted possession the evidence shows that immediately after the sale Dr. Elmer posted the northern and western perimeter of the property, established a subdivision in the northern part, built a road from the center to the southern boundary (the Gulf of Mexico) and along that boundary, and built a camp on the Gulf. The airstrip and the camps on properties leased by him have continued in use from shortly after his acquisition to the time of trial.
The Board contends that Dr. Elmer's possession was interrupted and disputed, *280 since it also exercised possession of the two sections. In support of this position the Board offered only the testimony of two of its employees, one of whom was generally unfamiliar with Cheniere Caminada. The other, employed since 1954 to look after Board property, testified that he posted signs on several occasions at the garbage dump and along Bayou Thunder, the northern boundary of the disputed sections, but that the signs were always torn down immediately. He denied ever seeing any of Dr. Elmer's signs posted on the property. Furthermore, he notified the persons who built the three camps near Bayou Thunder that they were on Board property.
One of the camp owners testified that he built the camp in 1932 and has leased it from Dr. Elmer since about 1948, without mentioning notice by the Levee Board.
Continuity of possession relates to the activities of the possessor, and interruption of possession relates to the activities of third parties. Dr. Elmer's possession was unquestionably continuous, and the action of the Board did not constitute an interruption of his possession.
The question of interruption in this case is closely akin to the question of public possession, which indicates that which is open and not clandestine. The purpose of the requirement of public possession is to inform interested persons of the possession in order to allow them to oppose it. Dr. Elmer's possession of the disputed sections and of the entire area within the boundaries of his deed was open and public, and was sufficient to notify anyone claiming that property of his adverse claim. In fact the Board employee admitted actual notice of the adverse possession by the campsite lessees.
Possession is equivocal when the acts constituting possession can be explained in two ways. In this case Dr. Elmer possessed the land simply as sole owner, and we have been offered no other explanation. He has thus proved unequivocal possession.
There is no issue as to peaceful or nonviolent possession.
We therefore conclude that possession for ten years has been adequately proved by Dr. Elmer.
Legal Title Sufficient to Transfer Property
The 1949 deed was a notarial act of sale which was complete and proper on its face, and which therefore would have been sufficient to transfer the ownership of the property therein described, had the title been derived from the real owners. C.C. arts. 3484, 3485. The instrument itself was valid in point of form, in that it stated the intention of selling, the description of the property sold and the consideration and receipt thereof, and it was signed by the parties to the sale, the witnesses and the Notary; it was certain so as to fix exactly the origin or basis of possession; and it was proved by production of the instrument itself, the original of which was registered in the proper conveyance records. C.C. art. 3486.
The property was described in the deed by the natural and artificial boundaries which comprised its perimeter. Although the numbers of the disputed sections were omitted from the specific enumeration of sections and the acreage recited in the deed corresponds to the total acreage of the named sections, the metes and bounds description controls over other designations. C.C. art. 854; Texas Company v. O'Meara, 228 La. 474, 82 So.2d 769 (1955); Ganucheau v. Monnot, 130 La. 463, 58 So. 150 (1912).
The boundaries used to describe the perimeter of the property were certain and easily identifiable.[4]
*281 We therefore conclude that Dr. Elmer's 1949 deed was a legal title sufficient to transfer the property.
Good Faith
The Board contends that Dr. Elmer was not in good faith because his title, being a non-warranty or quitclaim deed, should have put him on notice of possible defects. It further contends that the omission of the numbers of the two disputed sections from the description and two unusual recitations contained in the deed should have alerted the purchaser as to the quality of his seller's title.
A quitclaim claim is a deed translative of title and thus sufficient to support ten years acquisitive prescription. Bolding v. Eason Oil Co., 248 La. 269, 178 So.2d 246 (1965). However, just title and good faith are two separate elements, both of which are required,[5] and the Bolding case merely holds that a quitclaim deed is sufficient to constitute just title for prescription purposes. Since a quitclaim deed from the true owner would have passed a good and valid title, a quitclaim deed is a just title sufficient to support a plea of acquisitive prescription.
However, good faith is a separate consideration. To be in good faith the possessor must legitimately and reasonably believe that the person from whom he obtains title is the true owner of the property. C.C. art. 3451.
Good faith is always presumed in matters of prescription. C.C. art. 3481. But early cases held that the seller who sells only his right, title and interest or declines to generally warrant his title thus brings home to the buyer a knowledge of possible defects in the title.[6] These cases were discussed in Read v. Hewitt, 120 La. 288, 45 So. 143 (1907), in which a deed from a person holding an endorsed patent recited the sale of "all my right title and interest." When this deed was attacked more than 20 years later, the court held that there was not the slightest evidence of bad faith shown in either the buyer or the seller.
Later cases have taken the less onerous view that a nonwarranty deed does not tend to prove bad faith, but the buyer may explain why he was not put on inquiry by the exclusion of warranty. The view at the other extreme was expressed in Land Development Co. of La. v. Schulz, 169 La. 1, 124 So. 125 (1929) that a non-warranty indicates that the seller, not the buyer, lacked faith in the title.
In our opinion this latter view is an incomplete approach to the question of good faith since the buyer must legitimately believe that the seller had a good and valid title in order to be in good faith. Any doubt as to the validity of title expressed by the seller in the deed can reasonably raise a doubt in the mind of the other party to the same deed.
The Supreme Court in Knight v. Berwick Lumber Co., 130 La. 233, 57 So. 900 (1912) spoke of the possessor claiming good faith as follows:
"If he doubts the validity of his title, his possession cannot be the basis of the prescription *282 of 10 years. * * * Doubt as to ownership, or the right to alienate, is inconsistent with good faith, because doubt is the mean between good and bad faith. Good faith demands a firm and positive belief."
We believe that a more complete approach in the case of a nonwarranty deed is that such a deed is not alone sufficient to preclude good faith on the past of the possessor (as held in the early cases), but must be considered with other evidence that the possessor doubted the validity of his title. A person ignorant of defects in his title is a good faith possessor, C.C. arts. 503, 3451, and a person who knows of defects in his title is a bad faith possessor, C.C. art. 3452. The determination must stand or fall on the facts and circumstances of each case.
In assessing the facts and circumstances of a case in order to determine good faith, the courts have consistently followed the principle that there is generally no duty for the buyer to investigate his title.[7] This is consistent with the notion that good faith consists of complete ignorance of any suspected defect in the title. However, a different situation exists where certain facts known to the buyer constitute a warning that further inquiry is needed, and in that case a duty is imposed to investigate beyond the immediate seller.
In Juneau v. Laborde, 219 La. 921, 54 So.2d 325 (1951) the Supreme Court stated:
"With the information that he possessed, which was certainly sufficient to excite inquiry, a duty devolved upon him to investigate the title before purchasing." (Emphasis supplied.)
In the present case if the deed and the recitations therein, considered with proved knowledge of other facts, were sufficient to put Dr. Elmer on notice that he must inquire further into the validity of his title, then he was in legal bad faith, because he could not have reasonably and legitimately believed that his seller's title was valid.
Dr. Elmer acquired the property from the Zodiac Corporation, who had acquired this among 67 properties from John Albion Saxton in 1931. It is undisputed that Saxton and the corporation were interrelated, but that Dr. Elmer had absolutely no connection with the corporation.
After Saxton's death his widow showed a real estate agent an "attic full of papers" concerning his acquisitions, most of which were by tax sales. The agent agreed to handle the sale of the properties and initiated negotiations with Dr. Elmer, a long time acquaintance. A price of $3,300.00 for approximately 1,500 acres, or slightly over $2.00 per acre, was agreed upon. As to the nonwarranty deed, the agent testified that this was to be expected for a sale at that price of that much land. He further stated that it did not take much to convince Dr. Elmer to buy the land at that price and that Dr. Elmer knew that Louise Saxton, the secretary of Zodiac Corporation, was an heir of John Saxton. The agent did not furnish an abstract or a title opinion to Dr. Elmer.
Dr. Elmer testified that the real estate agent informed him that he had taken over some of Saxton's affairs and had found a number of properties in Orleans and Jefferson Parishes that could be sold or recovered. He also was aware that the sale was without warranty.
The act of sale was signed by the real estate agent and Dr. Elmer's attorney as witnesses, although Dr. Elmer testified that neither his attorney nor anyone else examined the title for him or rendered a title opinion to him.
Dr. Elmer further testified that after he bought the property and posted the signs, he was informed by a telephone call of some adverse ownership (not of the property *283 now in dispute). In checking his title, he found Sections 24 and 25 were not included. When he was unable to find the property assessed in any other name, a deputy assessor advised him to have the two sections assessed on a supplemental roll in the name of "Dr. William J. Elmer or unknown owner," to neglect to pay the taxes, and to purchase the property at a subsequent tax sale. This was done, and the tax title was confirmed in due time.
Of course, the tax sale and the judgment of confirmation were annulled by the trial court.
Therefore, Dr. Elmer was not in legal good faith shortly after the sale. For purposes of ten year acquisitive prescription, it is sufficient if the possession commenced in good faith. C.C. art. 3482. If we accept Dr. Elmer's testimony about the telephone call, this loss of good faith after the sale and the commencement of possession would not affect his claim.
But there are many other considerations which indicate the lack of legal good faith in this case at the time of the sale.
The purchase price of $3,300.00 included seven smaller parcels and the larger one (1,210 acres), which encompasses the two sections in dispute. The description of the larger parcel concluded with the following:
"Being the same property together with other parcels of land purchased by vendor herein November 22, 1921, and taken by actual and corporeal possession November 29th, and 30th, 1921, being the same property together with other parcels of land forfeited for unpaid State Taxes, etc. in the names (sic) of Lafort, Johnson, Train, Gormly, et als., C.O.B. Sf596, C.O.B. 53 Folio 240, etc." (Emphasis supplied)
The act also included the following condition:
"The purchaser undertakes to redeem any and all of the above described property which may be the subject of tax sales, either to individuals or to the State of Louisiana at his own cost and expense, and assumes the payment of all present or past due taxes that may be due and owing on said above described real estate."
The act of sale therefore not only excluded warranty, but also specifically recited that the vendor's title was based on tax forfeitures 38 years previously. Furthermore, the recital as to the exact time that actual and corporeal possession was taken indicated that the ancestor had placed some reliance on this possession. It is unreasonable to believe that Dr. Elmer's attorney accompanied him to the sale, but did not question the unusual recitations in the deed or advise him regarding them.
The sale price of $2.00 per acre in 1949 is suspicious in itself, as somewhat verified by the real estate agent, but this price is even more jaundiced in a non-warranty deed from someone claiming possession for 38 years. Furthermore, the 553 acres in the two sections are in addition to the 1,210 acres contained in the enumerated sections, thereby even further reducing the price per acre.
The above considerations and the admitted knowledge of the background of the property acquisitions, and the general tenor of the record, convince us that good faith acquisitive prescription does not apply in this case.
The purpose of acquisitive prescription is to assure certainty and stability to the title of an innocent person in a normal sales transaction. When the status of innocence is reduced because the property is sold without warranty at a suspicious price by a person who is known to deal in tax titles, and the other factors peculiar to this case concur, we must conclude that the buyer was in doubt as to the complete validity of his title. The good faith requirement of C.C. art. 3487 is met only when the buyer reasonably and legitimately believes that his seller is then the true owner. A person is allowed to rely blindly on an apparently *284 valid title from the apparent owner. But he is not blind who will not see. When there cannot be a reasonable and legitimate belief in the validity of the seller's title, the purpose of the ten year acquisitive prescription articles no longer pertains.
For the foregoing reasons, the judgment of the district court is reversed and the reconventional demand is dismissed.
Reversed.

ON REHEARING
Before LEMMON, GULOTTA and STOULIG, JJ.
LEMMON, Judge.
We granted a rehearing limited to the issue of good faith.
We originally held that while each of the various facts and circumstances bearing on the issue of good faith would perhaps, when standing alone, not be sufficient to overcome the presumption of good faith, the combination of a sale at a suspicious price by non-warranty deed, which recites the acquisition by tax sale and the fact of the vendor's taking possession of the property immediately after the tax sale, should have instilled a doubt into the mind of a reasonable purchaser or excited inquiry as to the validity of his vendor's title.
Dr. Elmer urges on rehearing that the record contained nothing to cast suspicion on the purchase price, since no evidence was introduced as to the value of the property at the time of his purchase. There was testimony regarding the price received for certain leases and sales of servitudes in subsequent years. The record also contained an act of sale (two years after Dr. Elmer's acquisition) of two subdivision lots, measuring a total of less than one-half acre, for $700.00, or more than 20% of the purchase price of the entire tract which measures in excess of 2,000 acres. Additionally, there is a map of Gormley Subdivision in the record which, while not introduced for the purpose of establishing value, did have markings which indicated the sale prices of the lots.
In our original opinion we reached a conclusion as to value from evidence introduced for other purposes. On reconsideration, while we believe the above evidence reflects on the value of the property at the time of Dr. Elmer's acquisition, we further believe our goal of substantial justice will be better accomplished by remanding this case to the trial court for the sole purpose of establishing more conclusively the value at that time. In our opinion the reasonableness of the purchase price is one of the critical factors bearing upon the issue of good faith.[1]
*285 For these reasons, the case is remanded to the district court for a determination of the value of the property at the time of Dr. Elmer's acquisition from the Zodiac Corporation, and for further proceedings consistent with the expressions in this opinion.
Remanded.
NOTES
[1] See R.S. 38:1041.
[2] Board of Commissioners of Caddo Levee District v. Pure Oil Co., 167 La. 801, 120 So. 373 (1929); Board of Commissioners of Tensas Basin Levee District v. Earle, 169 La. 565, 125 So. 619 (1929).
[3] Haas v. Board of Commissioners of Red River, Atchafalaya and Bayou Boeuf Levee Districts, 206 La. 378, 19 So.2d 173 (1944).

The author of this opinion disagrees with these decisions, but is bound by the authority of the Supreme Court.
[4] There is a reference in the description to Bayou Fort Blanc, which is not exactly one of the northern boundaries, but this was satisfactorily explained by the surveyor, and the point is not argued on appeal.
[5] Bel v. Manuel, 234 La. 135, 99 So.2d 58 (1958).
[6] Reeves v. Towles, 10 La. 276 (1836); Eastman v. Beiller, 3 Rob. 220 (1842); Avery v. Allain, 11 Rob. 436 (1845). As stated in Saunders, Lectures on the Civil Code, p. 135 (1925):

"The earlier decisions were to the effect: that if the vendor sold only his right or title to the property, and a fortiori if he sold it with exclusion of warranty or with against only his own acts, he practically notifies the purchaser that he, the vendor, had no title, and to suspect that his title was bad. Ordinarily, when people have good title, they are perfectly willing to sell with warranty; and it is equally certain that if they have a bad or doubtful title they will exclude warranty. No man will warrant a title that he believes to be bed, and if warranty is excluded there is every reason to believe his title to be bad, and by excluding warranty he informs the purchaser that he believes his title to be bad."
[7] See, e. g., Martin v. Schwing Lumber & Shingle Co., 228 La. 175, 81 So.2d 852 (1955).
[1] The author of the opinion believes that the codal articles on good faith prescription were designed to cure by the passage of ten years a defect in the title of a person who, in complete and reasonable belief in his vendor's title, fairly contracted to acquire for himself a perfect title and thereafter exercised possession in reliance on that title. In a subsequent contest between that purchaser and the true owner, who neglected for ten years to protect his property rights by asserting possession or by contesting the purchaser's possession, the law favors the good faith purchaser as between the two innocent parties.

I do not believe the purpose of these codal articles was to permit the passage of ten years to cure the defects in the title of a person who speculated by purchasing property at an insignificant price under a quit-claim deed (especially from a vendor who acquired by tax sales) or other deed of doubtful validity. There is no legal good faith in this type of purchaser, and only the prescription of 30 years is applicable.
If, after trial on remand, it is found that the purchase price paid by Dr. Elmer in 1949 was so insignificant in comparison to the actual value of the property that, when considered with the other facts and circumstances of this case, he could not have reasonably believed his vendor's title was valid, his claim of ownership based on possession for ten years in good faith should be denied.