136 So.2d 513 (1961)
Stanley MESTAYER et al., Plaintiffs-Appellants,
v.
CITIES SERVICE DEVELOPMENT COMPANY et al., Defendants-Appellees.
No. 333.
Court of Appeal of Louisiana, Third Circuit.
November 29, 1961.
Rehearings Denied January 31, 1962.
Certiorari Denied March 27, 1962.
*514 Henican, James & Cleveland, Kalford K. Miazza, Mestayer & Simon, by C. Ellis Henican, New Orleans, for plaintiffs.
Julius B. Nachman, Alexandria, for Mrs. Mildred B. Carpenter and the Heirs of C. M. Carpenter.
Anderson, Hall, Raggio & Farrar, by Richard A. Anderson, Lake Charles, for Sun Oil Co.
Landry, Watkins, Cousin & Bonin, by Jack J. Cousin, New Iberia, for the Duhe-Sealy Group of defendants.
Armentor & Resweber, by Minos H. Armentor, New Iberia, for the Heirs of Albert Mestayer.
Bailey & Mouton, by George J. Bailey, Lafayette, for Cities Service Production Co. and others.
Helm, Simon, Caffery & Duhe, by Lawrence P. Simon, New Iberia, for Texaco, Inc.
Voorhies, Labbe, Voorhies, Fontenot & Leonard, by Bennett J. Voorhies, Lafayette, for Walter Delahoussaye & Emma Delahoussaye Doerle.
Eugene D. Broussard, Newton T. Pharr, New Iberia, Curators for certain absentee defendants.
Edmund McIlhenny, New Orleans, for Myrthe Celeste Schwartz, and others, appellees.
F. Xavier Mouton, Lafayette, for Irsi Dugas Buszek, and other appellees.
Henry A. Mentz, Jr., Hammond, for Kenneth Reid Dupuy, appellee.
Alvin J. Liska, John P. Yuratich, New Orleans, for Mabel Mestayer, appellee.
En Banc.
TATE, Judge.
This petitory action was filed in 1955. The plaintiffs are descendants of, or assigns of descendants of, Francois and Ida Mestayer, husband and wife, who died in 1872 and 1883 respectively. By this suit the plaintiffs claim title to 114.56 acres, contending that this relatively small strip of a large tract formerly owned by the estate of Ida Mestayer was never sold in her succession or by her heirs.
Made defendants are the present possessors of the land claimed, including various mineral lessees. Certain other Mestayer co-heirs or their successors in title, alleged to be co-owners with plaintiffs but who did not join with the latter in their demand, *515 are also joined as nominal defendants. A mineral lessee of many of the Mestayer heirs intervened in the suit, praying that its lessors' interest be recognized, subject to intervenor's mineral lease.
The trial court held that the plaintiffs have no title to the property claimed by this suit because an 1888 administrator's sale was intended to and did convey to various purchasers all of the remaining land formerly owned by Francois and Ida Mestayer, including the 114 acres which the plaintiffs seek to recover by this action. The court consequently dismissed the plaintiffs' suit, and they appeal to this court. The intervenor appealed, as also did certain of the defendants as to certain rulings.
The principal issue of this litigation involves the proper construction of the descriptions of land sold at an administrator's sale of November 3, 1888 in the succession proceedings of the Ida Mestayer estate. Aside from a small separated 33-acre tract, the succession realty sold at the sale consisted of a large contiguous tract of prairie and woodland, which was sold by lots "as per plan of survey of same made by D. T. Peebles, Surveyor, and hereto annexed for reference." The survey referred to is not, however, found recorded in the conveyance records, and a substantial controversy of this appeal is whether the "Peebles Plat" (Exhibit SCCM-36), recorded in 1916 in the miscellaneous records of the Clerk of Court's office, is the actual map referred to in the proces verbal of the administrator's sale.
Briefly, the plaintiffs contend that, in conjunction with the Peebles Plat, the lot descriptions should be interpreted so that the acreage or quantity call controls, and thus as conveying only the specified number of arpents. (According to the testimony, an arpent is approximately six-sevenths of an acre). As a result, it is alleged, not included in the land sold in 1888 was the eastern strip of the estate's large tract, to which strip the plaintiffs claim title by this action.
The Sun Oil-Carpenter-Cities Service-Mestayer ("SCCM") group of defendants (who possess the northern approximate half of the land claimed by the plaintiffs) contend, however, that a proper interpretation of the deed, including the Peebles Plat, is that it is a per aversionem sale conveying all the land within certain bounds reflected by the administrator's deed, which included all the remaining land owned by the estate. Thus there is no residue to which the plaintiffs have title. The District Court essentially agreed with the SCCM group's interpretation of the administrator's sale.
Yet a third construction of the deed is advanced by, respectively, the Duhe-Sealy group of defendants (who possess the southern half of the land plaintiffs claim by this suit), by Texaco (intervening as mineral lessee of many of the Mestayer heirs), and also by the plaintiffs alternatively to their principal contention. By this third construction, the Peebles Plat is regarded as an unauthenticated sketch of only part of the property conveyed, and the calls of the descriptions in the deed are regarded as so conflicting and irreconcilable that only the practical construction given the conveyances by the purchasers over the past decades can furnish the proper rule for the interpretation of what was actually conveyed by the descriptions of each lot.

I. The Mestayer Estate Lands.
To understand more fully the contentions of the various parties, it will be necessary first to summarize what the record shows to be the extent and general location of the Mestayer estate property prior to the 1888 administrator's sale.
In an 1883 succession inventory the land which included the forty lots later sold was described as follows:
"One Sugar Plantation at Fausse Pointe, in this Parish, containing about two thousand five hundred arpents, with all improvements thereon, situated and belonging, bounded as follows: North by Charles Mestayer and X. Louviere, South by Joseph Loreau, or *516 assigns, and Heirs of A. Gondran, and East by Fausse Pointe Lake"
On January 21, 1888, the Mestayer heirs sold to E. A. Pharr the eastern part of this plantation, the land conveyed being described as follows:
"That certain tract of Swamp Land lying and being situated in the parish of Iberia in this State at a place commonly called Fausse Pointe, bordering on that part of Grand Lake known as Lake Dauterive and containing in superficial area Nine Hundred and Thirty-07/100 (930 07/100) acres the whole bounded as follows to-wit: On the North by Charles Mestayer & others, on the South by John D. Broussard, on the East by Lake Fausse Pointe, and on the West by Estate of Ida Mestayer's lands, more fully described by a plat of survey of the said Swamp Land made by Dudley Peebles, Surveyor, on the ____ day of June, A. D., 1887 and making part of these presents."
The plat here referred to is actually attached in the conveyance records to the Pharr deed. From a more detailed subsequent description by section numbers of the property sold to Pharr, the western boundary of this Pharr tract is shown to be 70.92 chains east of an established section line; and all parties admit the correctness of the "Pharr line" as so located. The Pharr line is thus conceded to be the eastern boundary of the remaining tract of land to which the Mestayer estate held record title immediately prior to the administrator's sale of November 3,1888.
On May 21, 1888, the Mestayer heirs authorized the administrator to sell at public auction "all the property movable and immovable, belonging to said successionThe prairie lands to be sold in lots as surveyed by D. T. Peebles, Surveyor, and the Wood lands in lots of fifty arpents, more or less, to be surveyed by said Surveyor" (Italics ours).
Accordingly, a published notice dated September 25, 1888, advertised the administrator's sale for November 3, 1888 of the following property (being the original plantation tract above-described, less the land sold to Pharr):
"A Certain Tract of prairie land situated at Fausse Pointe, in said Parish of Iberia, containing four hundred and five 86-100th, superficial acres and bounded north by lands of Chas. Mestayer and others, east by those of said estate, below described, and west by those of Dorce Prince and of Norbert Mestayer.
"A Certain tract of wood land situated also at Fausse Pointe, in said parish containing fifteen hundred and eighty-six superficial acres, and bounded north by lands of Chas. Mestayer and of Hoffman, South by those of Raphael Segura, Homer Gonsoulin, Gustave Broussard and others, east by Lake Fausse Pointe and West by lands of said estate above described. * * *
"The prairie lands will be sold in lots as per plan of survey of same made by D. T. Peebles, Surveyor, and on file in the office of Breaux & Renoudet, New Iberia, La.

"The wood lands will be sold in lots of fifty arpents, more or less, also as per plan of survey of same made by said surveyor, and on file in the office of said Breaux & Renoudet * * *" (Italics ours.)
(Except for the reference to the Peebles surveys this description, incidentally, is generally the same as that found in a second estate inventory taken on May 8, 1888, of the remaining property belonging to the succession after the Pharr sale.)
By an actual reconstruction of the lands acquired by the Francois Mestayer community, as laid out physically on the ground, the evidence shows that, following the Pharr sale, the Mestayer estate had record title to the following lands in the section numbers and as depicted by the following sketch (Figure 1):
*517 

*518 II. The Administrator's Sale.

Pursuant to the advertisement, the administrator's sale took place on November 3, 1888. The proces verbal of the sale noted that the property was "sold in lots as per plan of survey of same made by D. T. Peebles, Surveyor, and hereto annexed for reference". It further noted that "In giving the description of the lots * * *, where the word Canal or Road is mentioned as a boundary, the same refer to the Canal or Road shown on the plat hereto annexed for reference." (As previously noted, however, no such plat is found annexed to the sale or recorded in the conveyance records of Iberia Parish.) The administrator's sale describes forty lots, each by lot number, arpentage, and bounds; although about three-fourths of the designated bounds are lots or roads or canals as depicted by the plat originally annexed to the sale.
From a reconstruction of the property sold, with or without the aid of the Peebles Plat, it is conceded that the Mestayer estate property was divided into two tiers or rows of lots, with a space dedicated for a road located along the center section line (see CDE on Figure 1), which divided the approximate northern half of the tract and northern row of lots from the southern half and southern row of lots. Thus, in general the lots in the northern tier were bounded south by said road and the lots in the southern tier were bounded north by said road.
The "Peebles Plat", which the plaintiffs and the SCCM defendants contend is the actual map referred to as annexed to the proces verbal of the 1888 administrator's sale, is not shown to have been recorded before 1916, when, without filing notation, it was placed in the Iberia Parish records at Miscellaneous Book 6, pages 456 and 457. There is no indication on this plat to show that it was at one time attached to the administrator's sale. In its present state, it consists of two fragments of paper, evidently having been worn in half by wear. There are numerous markings on the plat, many of which are shown to be later interpolations or additions. The portions of the plat conceded to be authentic appear to represent thirty seven (not forty) lots arranged in two rows or tiers; Lots 1, 2, 3, together with the odd-numbered lots from Lots 5 through 37 form the northern tier, and the even-numbered Lots 4 through 36 form the southern tier. (Lots 38, 39, and 40 are not shown on the fragments of the plat.)
There are no indications on the plat as to adjoining owners execpt that the western boundary of Lot 4 is shown as "Loreauville Road". Except for a notation at one point on the plat that the road there shown was thirty-six feet wide, there are no linear measurements indicated, nor are any courses or distances shown.
It is agreed that Lots 1 through 17 were in the approximate western half of the large estate tract sold and were prairie lands. By reconstruction through the descriptions in the deed, it is indicated that these lots lay west of a canal now known as the Marshfield Canal. The arpentage descriptions and described bounding owners of these lots closely tie in with the actual area of the Mestayer estate land conveyed which was west of the Marshfield Canal. Through the accuracy of the arpentage and the bounding owner calls, in relation to the location of the Loreauville Road and the irregular shape of the western end of the Mestayer tract, the parties reach general agreement as to the location and extent of these western lots.
The disagreement which forms the basis of this litigation is as to the location and extent of Lots 18 through 40 sold by the 1888 administrator's sale, all of which lots were east of the Marshfield Canal. (See Figure 1.) The eastern part of the Peebles Plat shows Lots 18 through 37 as follows (Figure 2):
*519 
The SCCM defendants are the successors in interest to the purchasers of the northern tier of lots above depicted, namely of odd numbered lots 19 through 37. The Duhe-Sealy defendants are the successors in interest to Leopold DeBlanc, the purchaser at the succession sale of the end three southern lots above depicted (namely Lots 32, 34, 36), and also of Lots 38, 39 and 40.
The placement on the ground of these latter three lots38, 39, and 40forms a substantial question of this litigation. In general, both the plaintiffs and the SCCM defendants agree that these lots were intended to be situated in the Charles Mestayer tract located in the northwest quarter of section 27, located northeasterly of the Mestayer estate lands. (See Figure 1.) The Duhe-Sealy group however, contends that these lots should be placed within the Mestayer estate lands, east of Lots 36 and 37, between them and the Pharr line, which line all parties concede was the eastern boundary of the large tract to which the Mestayer estate had record title at the time of the sale.
Both the plaintiffs and the SCCM defendants accept the Peebles Plat as the *520 authentic map originally attached to the administrator's deed of 1888. But they draw differing legal conclusions from this circumstance.
Succinctly, the plaintiffs contend that the Peebles Plat controls what was sold by the administrator's sale, and that only by reproducing this plat on the ground can we determine what was intended to be sold at the sale. In short, the plaintiffs actually contend that the acreage call of each lot, as shown by the plat and by the administrator's deed, is controlling, and that therefore the surplus acreage east of Lots 36 and 37, after the Peebles Plat is laid out on the ground according to the acreage calls of each of the lots (that is, a strip between such lots and the Pharr line), was never sold by the estate and consequently still belongs to the Mestayer heirs or their assigns.
On the other hand, the SCCM defendants contend that by the administrator's sale all the land between the Marshfield Canal and the Pharr line was intended to be sold by the sale and that, giving proper controlling weight to the bounding calls ("east by Pharr") of lots 36 and 37 (the lots on the east end of the Peebles Plat), the administrator's deed indicates that the eastern boundary of Lots 36 and 37 (see XY on Figure 2) was intended to coincide with the Pharr line (see AB on Figure 1). Thus, these defendants-appellees argue, the administrator's deed with the attached Peebles Plat shows that all of the land belonging to the Mestayer Estate was sold at the succession sale, as is corroborated by the succession proceedings and certain other acts of the Mestayer heirs indicating a practical construction to this effect, so that the plaintiffs' claim is without foundation that a residue of estate land was left unsold in 1888. The SCCM defendants thus argue that any acreage in excess of the total acreage calls of the lots is by law to be apportioned among the purchasers rather than retained by the vendors, since this was a sale of all the land within certain limits. See LSA-Civil Code, Articles 851, 854.

III. The "Peebles Plat", Exhibit SCCM-36.
Before discussing in further detail the contentions of the parties, we think it well at the threshold to decide whether the Peebles Plat is indeed the map which was originally annexed to the 1888 administrator's sale, as contended by both the plaintiffs and the SCCM defendants. The present absence of any depiction thereupon of Lots 38, 39, and 40 is, incidentally, explained by the plaintiffs and the SCCM defendants by the suggestion that such lots were located on the missing upper righthand corner of the plat, which was apparently torn off over the course of the years.
The authenticity of the Peebles Plat is central to the plaintiffs' arguments that the administrator's deed, with this plat annexed, clearly and unambiguously conveys only lots with arpentages as described to the hundredth decimal, which quantity cannot be varied by extraneous evidence or other rules of construction; that the authentic plat does not permit the placing of Lots 38 through 40 east of Lots 36-37 and in the land claimed by the plaintiffs; and that the limits of the lots sold reflected by the plat control, if conflicting with the worded descriptions of the bounding calls set forth in the administrator's deed.
We are unable, however, to hold that evidence preponderantly proves that the Peebles Plat, Exhibit SCCM-36, is the genuine map referred to in the administrator's sale as annexed thereto.
It is true that the body of the plat was indeed sketched by the hand of Peebles, according to the weight of the evidence. But the plat is undated and unsigned, nor is it paraphed or otherwise identified as forming part of the administrator's sale. And, so far as the record shows, the plat was not placed in the clerk's office until 1916, when (without any filing data) it was pasted in Miscellaneous Book 6. The lot numbers, placement, and arpentages do indeed tie in with the descriptions of lots 1 through 37 *521 of the administrator's deed; but such coincidental circumstances could be equally true of a preliminary or subsequent sketch or copy of all or part of an original plat.
With regard to this exhibit, it can be seen that no courses, distances, directions, or bounding owners are shown. Some of the north-south lot lines run raggedly over the south line of the bottom tier of lots. Lots supposed to be of equal extent according to the arpentage calls nevertheless have widely differing dimensions when physically measured on the Peebles Plat, while the road drawn between the northern and southern tier of lots is, on the plat, approximately three times the correct width proportionate to the lots depicted. See Munson, Tr. 18:1551-1552, 1626.
On the Peebles Plat, the dividing lines between the lots on the north tier is shown to be a straight-line continuation of the dividing lines between lots on the southern tier, so that (if there were no road) each set of four lots would have a common corner (e.g., see lots 18, 19, 20, 21 Figure 2); but, in fact, the dividing lines of the lots on the northern tier east of the Marshfield canal are slightly to the west of the dividing lines of the lots on the southern tier according to the reconstructions of all the surveyors testifying, because the first western lot on the northern tier (Lot 19, with a described 52.13 arpents) is narrower by arpentage description than its corresponding lot on the lower tier (Lot 18, with a described 58.10 arpents). See survey exhibits: Munson 4; Rochel 1; Mott 2; SCCM-51 (Fenstermaker Plat). See also Figures 3 and 4 below.
Certain section numbers and dashed section lines are now found on the Peebles Plat, but some or all of them are misplaced several hundreds of feet (by rough scale) according to all of the surveyor witnesses. There is substantial evidence that such notations were placed on the Peebles Plat by another hand than that of Peebles and at a later date than that on which the body of the plat was composed, which, especially in view of their inaccuracy, we will accept as preponderating.
All of these inaccuracies and incongruities are inconsistent with the thesis that the Peebles Plat is the formal result of a detailed survey on the ground, intended to be filed with the deed as a permanent muniment of title.
Moreover, in contending that the Peebles Plat is the genuine map originally annexed to the administrator's sale, both the plaintiffs and the SCCM defendants must explain the absence of Lots 38, 39, and 40 from the Peebles Plat. These parties do so by suggesting that such lots were located in the Charles Mestayer land in the Northwest Quarter of Section 37, alleging that such lots would therefore be depicted to the northeast of Lot 37 and in the righthand corner portion of the Peebles Plat now torn off. But when these lots were added on the photocopy of the Peebles Plat and placed as contended by plaintiff in relation to Lot 37, it was shown that there was not room for them on the plat, since the representation of these lots, according to the approximate scale of the rest of the plat, then overlapped the edge of the Peebles Plat. See Exhibit Munson D1; Munson, Tr. 18:1594-1596. (Placing these lots in relation to Lot 37 as contended by the SCCM defendants likewise produces some incongruities. See Exhibits Munson 10, Munson X-2; Munson, Tr. 18:1589-1594, 1616-1621.)
Some reliance is placed upon a notation made in the conveyance book on the page the administrator's sale is recorded, stating "For map see Misc. 6pgs. 456 7 457," which is the correct citation to the present recordation of the Peebles Plat. Tr. 11: 64. However, although the Chief Deputy Clerk testified that cross-notations similar to this have been the custom in the clerk's office at least since 1929 (Tr. 11:82), no effort was made to produce any evidence as to when or how this particular informal notation was made on the copied recording (not the original) of the administrator's *522 sale, nor whether it was in the handwriting of any past or present member of the clerk's staff. Much weight cannot be attached to this notation, in view of these facts and of the complete lack of any evidence that the Peebles Plat was ever attached to the administrator's sale or of any evidence of the plat's whereabouts between 1889, the date that said sale was recorded, and 1916, the date that the plat was placed in the miscellaneous book without any filing mark or date thereupon. Tr. 11:63.
Considering all these circumstances -including the inexactness and other incongruities of the unsigned plat, the lack of evidence that it was ever attached to the administrator's deed, and the evidence that, so far as the record shows, the Peebles Plat was not placed in the clerk's official records until 1916, or 28 years after the sale, we are unable to hold that the authenticity of the map has been sufficiently proved as to permit it to serve as a controlling muniment of title. Broussard v. Guidry, 127 La. 708, 53 So. 964; Wilson v. Hoffman, 115 La. 903, 40 So. 328; see also, Futrell v. Holloway, La.App. 2 Cir., 149 So. 167. We conclude then that the Peebles Plat is not indicative as to whether the eastern bounding line of Lots 36-37 (XY, Figure 2) was or was not intended to be the Pharr line and as to whether Lots 38, 39, and 40 were or were not intended to be placed between Lots 36-37 and the Pharr line.

IV. Estate Land on the Ground in 1888 are Compared With Described Quantity Sold by the Administrator's Deed.
Extrinsic evidence then must be considered to determine the placement on the ground of the lots sold as described by the administrator's deed of 1888. Without the aid of the surveyor's plat originally annexed, the deed's intent in this regard cannot be determined from the deed itself. There is a conflict between the bounding owners of these lots as described by the descriptions in the deed, and those that result when these lots are laid out upon the ground according to the described arpentage. It is completely impossible, from the deed itself (as well as, we may add, from all the evidence), to determine the placement on the ground of lots 38, 39 and 40 or to discover definitely whether such lots were intended to be located within the limits of the large estate tract above shown on Figure 1.
The plaintiffs contend that, whether intentionally or not, the administrator's sale did not convey all the land then owned by the Mestayer estate. Primarily, they contend in this regard that the acreage calls of the lots conveyed are most important, since bounding lands as described in the deed are very difficult to reconcile with the actual bounding owners on the ground.
If, however, we concentrate on quantity and disregard the described bounding owners, we must note that there is little variance between the land belonging to the estate at the time of the administrator's sale in 1888, and the total quantity described as sold by said sale.
The forty lots conveyed were described in the administrator's deed as containing a total of 2,259.49 arpents. Converted into acres (an arpent is .84628 of an acre, see Tr. 13:420), the total quantity described as sold thus is 1912.16 acres. As noted by the trial court, summarizing the official government surveys and township plats available in 1888, by such available records a total of only 1,869 acres was included within the tract to which the estate held record title in 1888 (see Tr. 10:128, 133). Thus the administrator's sale called for 40.70 acres of land more than was available to the estate per its recorded title as based on the government surveys.
However, as the surveyors noted, there was actually more area on the ground within the estate's limits than was reflected by the old government surveys, because commonly the measuring chains anciently used stretched with wear. According to the surveyor *523 testifying for the plaintiffs, for instance, there is in fact a total of 1916.72 acres on the ground within the limits of the large Mestayer Estate tract shown on Figure 1.[1] Thus, accepting this latter figure, the estate actually held record title to 1916.72 acres on the ground, while the forty lots sold were described as containing 1912.16 acres.
But, in addition to this area contained in the lots, an additional area must be allowed for certain canals and roadways lying within the Mestayer estate tract; for these roads and canals, according to the lot descriptions, were not included as part of the acreage within the limits of any of the lots sold. At no point in the evidence could we find an estimate as to the total area included within these canals and roads, which area must be deducted from the total acreage of the land to which the Mestayer Estate held record title, in order to determine the actual area of Mestayer land available for sale in lots.
It may safely be said, however, that by all the recent surveys introduced in evidence, there is a very close correlation between the total acreage within the Mestayer estate tract and the combined acreage found by totalling the described quantities of the forty lots. And, allowing for the roads and canals, the preponderance of the surveying testimony indicates that there is slightly less land on the ground than is called for by the arpentage descriptions of the forty calls described as sold by the administrator's deed.
With especial regard to the estate lands east of the Marshfield Canal (since it is conceded that lots 1 through 17 were situated in and included the estate tract west of the Marshfield Canal): the surveys on the ground show that between the Marshfield Canal and the Pharr line there was between 1142.14 (Frantz, see Exhibit Duhe 91) and 1162.17 (Fenstermaker, Tr. 13:328) arpents. Another surveyor found that there were 1147.34 arpents in this area, based upon the government surveys, which he conceded showed slightly less land than would actually exist on the ground. Mott, Tr. 16:1110, 1111, 1190, 1197. The described arpentage calls of Lots 18 through 40 totals 1149.32 arpents (assuming that these lots must be located in the estate tract east of the Marshfield Canal, since there was no other property belonging to the Mestayer estate in which they could be situated).
Thus, if the forty lots sold by the deed were situated in the only land available for the purposes to which the Mestayer Estate held record title at the time of the administrator's sale, then the quantity calls in the deed itself, by their close total correlation with the total land on the ground owned by the estate on the ground, do not support the plaintiffs' contention that some of the Mestayer property was not sold at the sale. Rather, this correlation tends to corroborate a construction of the deed by which all the land then owned by the estate was sold at the administrator's sale in 1888.

V. Placement of Lots 38, 39, and 40.
The plaintiffs argue, however, that all forty lots were not intended to be placed within the limits of the large tract to which the Mestayer estate held record title. They contend that only Lots 1 through 37 were intended to be so located within said tract and that the arpentage calls of the deed were *524 intended to control. Lots 1 through 37 contain a described total of 2118.69 arpents (or 1793 acres), while on the ground over nineteen hundred acres are included within the limits of the Mestayer estate tract. The plaintiffs therefore claim title to this unsold excess, alleged by them to be a surplus of approximately one hundred acres beyond the limits conveyed at the administrator's sale. (As earlier stated, however, there is no such surplus beyond the quantity described as conveyed, if within the estate tract are located Lots 38 through 40 with their deed-described quantity of 140.80 arpents, i. e., 119.15 acres.)
Graphically, the plaintiffs' reconstruction on the ground is shown by Figure 3 below, a representation essentially based upon the plat introduced into evidence by the plaintiffs as Exhibit Munson 4; the hatched area represents the area claimed by them as unsold.

*525 Before discussing the contentions as to placement of Lots 38, 39, and 40, it is not inappropriate to state that there is considerable force to the plaintiffs' contention that the arpentage calls of the lots were intended to be accurate and resulted from an actual detailed survey by Peebles on the ground. In this connection, we note:
None of the lots are described as containing "more or less" a certain number of arpents; to the contrary, twenty-two of the forty lot descriptions indicate arpentages to the precise fraction: See, e. g., Lot 18, 58.10 arpents; Lot 19, 52.13 arpents; Lot 36, 50.63 arpents; Lot 37, 47.66 arpents; Lot 38, 45.24 arpents; Lot 39, 47.78 arpents; Lot 40, 47.78 arpents. The preponderant indications, furthermore, are that even the woodland lots east of the Marshfield Canal were actually surveyed on the ground. For instance, the May 1888 authorization of the Mestayer heirs to sell the land at public auction stated that the prairie lands had already been surveyed but that the "Woodlands" were "to be surveyed", whereas the September 1888 advertisement described both woodlands and prairie lands separately as to be sold each "per plan of survey * * * on file * * *" in the attorneys' offices. The contested accounting of the estate expenses indicates several weeks of surveying in the field by Peebles in July and September of 1888 and even thereafterthat is after May, when only the prairie lands had already been surveyed. See Succession of Ida Mestayer, Exhibit SCCM 5-A; especially at Tr. 7:115-116, 120-121, 135, 137-138.
Taking into consideration this detailed survey and several other factors, plaintiffs argue that Lots 38, 39 and 40 could not have been intended to be located in the area of the Mestayer estate tract west of the Pharr line. They contend, joined by the SCCM defendants, that the intention must have been to locate these lots northerly thereof, in the northwest quarter of Section 27 (see Figure 3), to which record title in 1888 was in Charles Mestayer, who had acquired it in 1859 from his father Francois Mestayer (i. e., the ancestor of all plaintiffs, whose lands were sold at the administrator's sale in 1888).
This contention is based on several grounds.
First, the descriptions of these lots show that Lot 39 was north of Lots 38 and 40, which latter two lots adjoined one another on a tier south of Lot 39.[2] If this group of lots was intended to be located west of Lots 36 and 37, with Lot 39 on the northern tier and Lots 38 and 40 on the southern tier, this would result in only eleven lots located between the Marshfield Canal and the Pharr line in the northern tier, as compared with twelve lots in the southern tier. The total of the described arpentages called for by each lot would, in the northern tier, beless than the area on the ground available, but in the southern tier be greater than such area. See Tr. 16:1197. Such an anomalous result could not be expected from a detailed survey, and the descriptions do not admit placing one lot partly on both tiers so as to absorb the surplus arpentage available on the northern tier and to avoid the deficiency in arpentage on the southern tier which otherwise results, if it is attempted to place this group of lots within the estate tract west of the Pharr line.
*526 In addition, if this is done, the dedicated roadways reflected by the descriptions of these three lots are inconsistent with the plan of the other lots, in which a roadway runs between the northern and southern tier, turning northward on the west side of Lot 37; according to the descriptions of Lots 38 through 40, if situated east of Lots 36-37 they would have an internal L-shaped roadway leading nowhere.
Second, if we assume Lots 38 through 40 are located in the ¾th quarter-section owned by Charles Mestayer in the Northwest quarter of Section 37, there is an extremely close correlation between the total arpentage called for by the descriptions of each of these three lots, plus roads, and the actual land available in this Charles Mestayer tract per government survey as of 1888. (See Tr. 10:134-136.)
Further, the bounding call of Lot 40, "South by E. A. Pharr", would place this group of lots north and east of the Mestayer estate tract; and placing them in the Charles Mestayer tract would satisfy such bounding call.
Finally, also relied upon as supporting such a placement is the circumstance that, nine months before the administrator's sale, the plat attached to the sale by these same heirs of estate land to Pharr in January 1888, SCCM8, shows the Charles Mestayer tract in question as a bounding tract owned by "Fr. Mestayer", not "Charles Mestayer". It is suggested that thus, for whatever reason, the heirs believed the Francois and Ida Mestayer estate still had title to such tract, which had in fact been in 1857 patented to Francois Mestayer but which had in 1859 (thirty years before the administrator's sale) been conveyed by recorded deed to Charles Mestayer.
However, several important factors also militate against this construction of the administrator's deed.
Most important, the record titles of the lands concerned do not support any assumption that Lots 38, 39, and 40 were situated on the land to which Charles Mestayer held record title, and not within land owned by the estate.
After acquiring the recorded title to the tract from Francois Mestayer in 1859, Charles Mestayer held title to such land until his death; it was sold in 1913 in the administration of his estate to those who presently possess the tract. See Exhibit 1-15, Tr. 8:105, 144-152; see also Exhibit 1-79, Tr. 10:37. The conveyance records therefore show that this property was never treated as owned by the estate; so far as these records show, Charles Mestayer always had a bona fide title to such tract following 1859, including at the time of the administrator's sale of 1888.
Likewise, the subsequent chain of title and acts of possession of the purchasers of Lots 38, 39, and 40 do not support a construction placing them in the Charles Mestayer tract rather than the estate tract. At the succession sale, these lotstogether with Lots 32, 34, and 36, on the southern tierwere sold to Leopold deBlanc; from him through mesne conveyances title was acquired by the Duhe-Sealy defendants. The purchasers in this chain of title took physical possession, so far as the record shows, approximately in 1921; but their acts of possession were all exercised within the limits of the Mestayer estate tract, and never once did those holding record title to Lots 38-40 attempt to assert ownership or possession under such title to any land in the Charles Mestayer tract. These purchasers' practical construction of the administrator's deed thus places Lots 38 through 40 within the limits of the Mestayer estate tract, and not in the Charles Mestayer property.
Under these circumstances, it is not readily conceivable that it was intended to locate Lots 38 through 40 on lands that the estate did not own. In reconstructing the placement of these lots six decades later, the surveyor testifying for the plaintiffs honestly admitted that he would not have *527 construed the deed so as to situate such lots in the northwest quarter of section 27, if he had known that such land was not owned by the estate. Tr. 18:1607, 1610. The only other surveyor who attempted to place these lots in such a manner, testifying on behalf of the SCCM defendants, admitted that it was at best "a very good guess" to place them in the Charles Mestayer tract. Tr. 13:349.
Further, it is not possible to give controlling weight to the south bounding call of "E. A. Pharr" for Lot 40, when the bounding call of Lot 38 on the north tier is described as "North by Mestayer". See footnote 2 above. If this group of three lots is located in the Charles Mestayer tract as contended, such north bounding call should be "North by Berger". See Figure 1 above. A bounding call of "North by Mestayer", however, is consistent with the northern bounding call of almost all the other lots on the northern tier within the estate tract, almost all of which were described as bounded "North by Charles Mestayer" (who in fact owned most of the land north of the estate tract); Lot 38's north bounding call therefore tends to support the placement of these three lots in the estate tract with the other lots sold by the administrator's sale, as contended by the Duhe-Sealy defendants. At any rate, it is not possible to assign greater weight to the "Pharr" call of Lot 40 than to the "Mestayer" call of Lot 38, one or the other of which must be incorrect.
The circumstance that the Pharr sale plat, SCCM 8 (Tr. 6:107), showed the ownership of the Charles Mestayer tract to be still in Francois Mestayer is not controlling, however corroborative it may be of the plaintiffs' theory. For the unquestioned fact of Charles Mestayer's continued ownership of the tract is reflected by the conveyance records. As the evidence in the present record indicates, it is not uncommon in descriptions of bounding properties to show former instead of present owners, since the intended accuracy is as to identification of the adjoining tract itself rather than necessarily of the present ownership thereof.
In summary, then, the placement of Lots 38 through 40 on the ground must remain an unsolved puzzle. Described as on a plat of estate lands to be sold at the administrator's sale, these lots cannot, it would seem, be located on a tract which did not belong to the estate. On the other hand, as described with relation to one another, these lots' placement within the estate tract, on the tiers with Lots 1 through 37, produces inexplicable incongruities with reference to the bounding roads and the resulting surplus of land on one tier, but deficiency of land on the other tier.
At this point we must notice that the SCCM defendants contend that a proper construction of the administrator's deed is that it is a per aversionem sale conveying all the land within the large estate tract. Since the western, northern, and southern lines of the large estate tract sold by lots are well-established, these defendants contend that the described bounds of Lots 36-37, shown as the end lots on the Peebles Plat, indicate that such lots were bounded "East by E. A. Pharr".[3] If this construction of the deed is then adopted, then the gross bounds of Lots 1 through 37 control, conveying all the land up to the Pharr line, the surplus acreage being proportionately distributed among Lots 1 through 37. See LSA-Civil Code, Articles 851, 854.
Graphically, the SCCM defendants' reconstruction on the ground of the administrator's sale is shown below by Figure 4, a representation essentially based upon Exhibit SCCM 51, the Fenstermaker Plat.
*528 
*529 This construction, of course, would tend to support the contentions that Lots 38 through 40 were located in the Charles Mestayer tract, since the intended bounds of Lots 36 and 37 would thus exclude such group of three lots from the area between them and the Pharr line. But the plaintiffs cannot urge such construction, because if this construction is accepted, then all of the estate lands were conveyed up to the Pharr line, thus divesting the plaintiffs' ancestors of title of the strip plaintiffs now claim by this suit.
Therefore, insofar as the plaintiffs' case depends upon the location of Lots 38 through 40 in the Charles Mestayer tract (or at least elsewhere than in the estate tract west of the Pharr line), we must say that the plaintiffs as non-possessors bringing a petitory action have not borne their burden of establishing by a preponderance of the evidence that the lots in question were indeed intended to be located outside of the large Mestayer estate tract. See Collins v. Sun Oil Company, 223 La. 1094, 68 So.2d 184; Frere v. Derouen, 104 La. 777, 29 So. 330.

VI. The Plaintiff's Burden of Proof.
Ultimately, the burden of proof which the plaintiffs must carry in this action assumes decisive importance. On the one hand, there are substantial circumstances supporting each of the conflicting theories of construction of the administrator's deed; on the other hand, no theory of construction satisfyingly explains all the circumstances surrounding and following the sale. In some respects the plaintiffs' theories of construction, by which some of the estate land was not sold at the administrator's sale, may be as reasonable as those of the defendants-appellees. But, under the burden of proof which the plaintiffs as non-possessors must carry, they cannot prevail against equally reasonable constructions advanced by those in possession of the land purchased from the plaintiffs' ancestors in title. See Frere v. Derouen, 104 La. 777, 29 So. 330, a petitory action by heirs, in some respects raising issues very similar to the present.
In a petitory action such as this, at issue primarily is simply whether the plaintiffs, who are not in possession, have title against certain defendants who are and have been in possession of the contested property; until the plaintiffs make out a valid title in themselves, the titles or weaknesses thereof of any of the defendants are not at issue. Code of Practice, Articles 43-45; LSA-C.C.P. Articles 3651, 3652; Cook v. Martin, 188 La. 1063, 178 So. 881 and cases there cited. As stated with extensive citation of authority in Blevins v. Manufacturers Record Publishing Co., 235 La. 708, 105 So.2d 392, 413-414, the established principles applicable to such litigation include: "[I]n a petitory action such as the present, the plaintiff out of possession must make out his title to the property claimed and must recover upon the strength of his own title and not upon the weakness of the defendants possessor's. * * * nor, in the absence of a written instrument, may title to immovables be created by estoppel. * * *"
It should also be noted that any obscurity or ambiguity in a sale is construed against the seller and those who stand in his shoes. LSA-Civil Code, Art. 2474; Texas Company v. O'Meara, 228 La. 474, 82 So.2d 769; Brown, Tutor v. Broussard, 43 La.Ann. 962, 963, 9 So. 911. This principle of construction plays some importance in the decision of this matter, since the administrator's deed does not itself unambiguously show whether or not all of the estate land on the ground was included within the quantity and/or the limits shown.
In summary, the primary issue before us is whether the plaintiffs have proved, by a preponderance of the evidence, their title to all or part of the land claimed by their petition. (Although some of the defendants sought in their pleadings to assert cross-claims against other co-defendants *530 and claimed title to some of the land in the latters' possession, these cross-claims are not before us upon this appeal, see VIII below.) Since we cannot determine from the deed itself whether it was intended to be controlled by the boundaries instead of by the quantities described, nor where Lots 38 through 40 were intended to be located so as to satisfy their calls, the plaintiffs must carry the burden of producing sufficient evidence to resolve in their favor these questions of construction.

VII. Practical Construction of the Administrator's Deed (including the Kemper Ownership Map of 1921).
As we have noted, the plaintiffs' case depends upon their proving that some of the Mestayer estate land owned by their ancestors was not sold at the administrator's sale of 1888. The plaintiffs contend, with some logic, that the deed's descriptive calls of bounding owners should not control since many of them are shown to be inconsistent or inaccurate. Disregarding such bounding calls, as previously noted there is no such variance between the total estate land on the ground and the total quantity of estate land described by the administrator's deed as sold, as to support the plaintiffs' contention that there was an unsold surplus. We have likewise seen, however, thatassuming there was no surplus and that all the forty described lots were situated within the limits of the estate tractit is virtually impossible to place the lots on the ground without incongruous results insofar as their deed descriptions are concerned.
Some of the defendants-appellees urge that thus the only sound rule of construction that may assist in the interpretation of the irreconcilable descriptions is that furnished by LSA-Civil Code Article 1956: "When the intent of the parties is doubtful, the construction put upon it, by the manner in which it has been executed by both, or by one with the express or implied assent of the other, furnishes a rule for its interpretation."
In accordance with this rule of practical construction, in examining the extraneous evidence as to the intent-indicating conduct of the Mestayer heirs, we find to be of compelling significance the uncontroverted showing that, for more than three decades following the administrator's sale, the Mestayer heirs construed the administrator's deed as having conveyed all the property then belonging to the estate. So far as the record shows, it was not until after 1921, upon the appearance of the Kemper Ownership Map (of which, more later), that any of the Mestayer heirs raised any contention that some of the former estate property was not included in the administrator's sale of the estate lands.
This conduct of the Mestayer heirs supports a practical construction that all of the estate property was intended to be and had been sold in the administrator's sale. We cite the following circumstances indicative of this construction, as summarized by the brief of the SCCM group of appellees:
"(1) * * * As heretofore pointed out, (SCCM-9) the heirs authorized and directed on May 21, 1888, the administrator to sell `all the property, both movable and immovable belonging to said succession.'
"(2) In the conclusion of his proces verbal of the succession sale (SCCM-10a) held on November 3, 1888, the administrator declared `there being no other property to be sold belonging to the said Estate, I have closed the sale.' This sale was ratified, approved and confirmed `in every particular' by all of the heirs (SCCM-10b).
"(3) Carlos Mestayer, one of the heirs, in filing a rule against the administrator to force the filing of an account declared on May 13, 1895 `that said administrator has long since sold the property belonging to the Estate' (SCCM-5a)
*531 "(4) After the above succession sale, the administrator filed both a provisional and final account of his administration showing in the active mass all assets purportedly owned by the succession, including proceeds of the succession sale. In none of these accounts did he list any real property whatsoever, or any part of the land involved in this suit as an asset of the estate or of the heirs, despite lengthy and extended litigation following numerous oppositions filed by these same heirs (SCCM-5a).
"(5) On appeal to the Louisiana Supreme Court from a judgment on some of the oppositions to his account, the administrator categorically stated that `all' of the property of the succession had been sold (SCCM-5b-brief of Zenon Decuir, administrator).
"(6) There was no judgment of possession rendered in the succession following the homologation of the administrator's final account sending the heirs of Ida Mayer Mestayer or Francois Mestayer in possession of any real property, much less of the land involved in this suit. (SCCM-5a) [In addition, the estate proceedings indicate that some of the heirs were still indebted to the estate at the time of the final accounting in 1895, as a result of which other of the heirs agreed to accept as their own share of the estate the aforesaid debts due to the estate from their co-heirs. Tr. 7:97. This is not consistent with the suggestion that there were any remaining estate land to be sold, which might have been used to reduce the net liability of the indebted co-heirs.]
"(7) No opposition was filed to the application of Zenon Decuir, administrator, to be discharged of his trust, and on May 22, 1896, the Court signed order granting his discharge, `it appearing to the Court that the affairs of the succession were completely settled, that all claims due by and to said succession were completely settled; and that all of the heirs of the deceased, Ida Mestayer, were settled.' At the hearing on this application, receipts were filed by the administrator from each of the then heirs for `balance due me as heir of the deceased Ida Mestayer.' (See concluding pages of SCCM-5a)
"(8) Following the succession sale in 1888 until the year 1921, no part of the land involved in this suit was listed on the tax rolls of Iberia Parish in the names of either Ida Mayer, Ida Mayer Mestayer, Francois Mestayer, Mr. or Mrs. Francois Mestayer, Estate of Ida Mayer Mestayer or Estate of Francois Mestayer, or [his or] her heirs (exhibit SCCM-63 and testimony of Robert J. Romero, Tr.Vol. 14:614-615).
"(9) The record reflects that the successions of numerous heirs of Ida Mayer Mestayer were opened in Iberia Parish after the succession sale, and in none of said successions was any interest in the land involved in this suit listed as an asset (Exhibit SCCM-65), (being stipulation between counsel of March 6, 1958).
"(10) The petition in this case shows that most of the plaintiffs are residents of Iberia Parish, thus living in close proximity to the land here involved. The Trial Court found from the plaintiffs' evidence that plaintiffs' ancestors lived generally in Iberia or St. Martin Parish in close proximity to the land here involved. * * *"
In resolving the ambiguity as to whether the administrator's deed was intended to include all the property owned by the estate, we may consider these subsequent acts as indicating a practical construction that all the property was sold (Texas Company v. O'Meara, 228 La. 474, 82 So.2d 769; Collins v. Sun Oil Co., 223 La. 1094,68 So.2d 184; Authement v. Weill, 197 La. 585, 2 So.2d 31), and we may also take into account the apparent intention to sell all the estate property reflected by the proceedings leading to the public sale (Highland Realty Company v. Feraud, 194 La. 535, 194 So. 11). The cases cited by the plaintiffs-appellees in support of their *532 contrary contention that the intent of the vendors at the time of the sale may not be determined from such conduct subsequent to the sale (Properties, Inc. v. Beckman, La.App. 1 Cir., 77 So.2d 161; Dupre v. Dupre, La.App. 1 Cir., 72 So.2d 589) are distinguishable; they concern unambiguous deeds, the unambiguous intent of which could not be varied by extraneous evidence.
We recognize the persuasive force of the argument of distinguished counsel for the plaintiffs-appellants that, even though the Mestayer heirs intended to sell all of the estate land, nevertheless they did not divest themselves of title if the surveyor Peebles did not in fact include some of the estate lands within the lots described as sold by the administrator's deed. In truth, considering the somewhat swampy and inaccessible nature of the land at the eastern end of the Mestayer estate tract, it is not at all inconceivable that Peebles really did not include all the land in the lots surveyed, not wishing to cause the expense of spending several days surveying such virtually worthless landthe six lots purchased by the Duhe-Sealy ancestors in title, for instance, sold for ten cents per arpent. For Peebles of course could not realize that more than two generations later, a rich oil field would be discovered underlying this then valueless land. But, however persuasive and possible such suggestions may be, their actuality has not been established by such a preponderance of the evidence as is necessary for the plaintiff to prove that some of the estate lands of their ancestors had not been sold in 1888.
But in addition to the contentions previously discussed, the plaintiffs alternatively rely also upon a practical construction of the administrator's deed by which, allegedly, the estate of Ida Mestayer retained title to 40.43 acres of land adjoining the Pharr Line. This practical construction of the deed is also urged both by Texaco, intervening as the mineral lessee of many of the plaintiffs, and by the Duhe-Sealy group of defendants. Essentially, this practical construction is that evidenced by the Kemper Ownership Map, which the Iberia Parish Police Jury had obtained in 1921 from the late Walter Kemper, civil engineer and surveyor.
The Police Jury had ordered this map for assessment and other purposes (see Exhibit Duhe 87, Tr. 9:166), and it was delivered in 1921 (see Exhibits Duhe 89 and 90, Tr. 9:175 and 176), soon thereafter being placed in the Iberia Clerk of Court's office (see Tr. 14:668). Mr. Kemper is dead; but his son testified that the map had been compiled from abstracts, records in the Clerk's office, and also from surveys on the ground where abstracts were not full enough to give the details. The son also stated, however, that at this late date it was impossible to ascertain what sources were used for the location of any individual tract shown by the map. Tr. 14:678-679, 691.
Subsequent to the availability of the Kemper Map to the public, over fifty instruments, including many sales and mineral leases, were executed by various of the defendants and of the plaintiffs construing Lots 18, through 40 to be located as shown by said Map and also, many of them, recognizing a 40.43 acre lot as still owned by the "Estate of Ida Mestayer".
By the construction shown by the Kemper Map (see Figure 5 below), a group of four extra lots are shown bounded east by the Pharr line and west by Lots 36-37, within the limits of the former larger Mestayer estate tract. Lots 38 and 40 are added to the south tier; Lot 39 and a 40.43 acre "Estate of Ida Mestayer" tract are added to the north tier. This 40.43 acre tract is shown as if it were Lot 41, that is, as the easternmost lot of the north tier; it is bounded on its west by Lot 39, south by Lot 40, east by the Pharr line, and north by the old Charles Mestayer tract (in the northwest quarter of Section 27).
*533 
*534 The witnesses justifying such a construction relied chiefly upon the blazed lines through the woods reflecting a possession of the land in accordance with the Kemper Map. See Exhibit Duhe 91; Exhibit Mott-2. The expert witnesses admitted frankly, however, that the age of these old blazed lines cannot be determined by the naked eye. There is no showing that the Kemper Map itself was based upon such possession in the field; as far as the record shows, in fact, most of the possession lines relied upon were not blazed until after availability of the Kemper Map.
The construction reached by the Kemper Map was rationalized by expert testimony agreeing with it as follows (see, e. g., Tr. 16:1191, 1197):
(1) Lots 38 through 40 must be placed within the Mestayer estate tract; they cannot be placed elsewhere, in land that did not belong to the estate. By so doing, however, we find only eleven lots in the north tier east of the Marshfield Canal, with a surplus of about thirty arpents of land on the ground more than called for by the deed; as compared with twelve lots on the south tier, with a deficiency of about thirty arpents on the ground less than the total quantity called for by the deed descriptions.
(2) To reconcile the land on the ground with that in the deed, the described quantity of each lot of the southern tier is proportionately reduced, in accordance with the principle recognized by LSA-Civil Code, Article 851; "If the titles exhibited call for a greater or less extent of land than the land which is to be bounded, contains, the limits must be so fixed as to divide proportionally among the parties interested the profit or loss resulting from this state of things. * * *"
(3) As to the northern tier, however, upon finding a surplus of land on the ground over those called for by the deed, the 40.43-acre tract established by blazed marks on the ground is regarded as not having been conveyed. The remaining lots on the northern tier were then also proportionately reduced, so that the acreage thereof could be contained within the reduced limits of the northern tier resulting from excluding the easternmost 40.43-acre tract from the property sold. (In effect, what was actually done was to add an additional lot to the northern tier in order to even up its lots with those on the southern tier.)
The SCCM defendants point out that the obvious fallacy in this reasoning is that each of the lots purchased east of the Marshfield Canal will then receive about two arpents less than is called for by the administrator's deed, merely to provide an additional unsold 40.43-acre lot; which extra unsold lot is not supported by any description or quantity call of the deed, nor by any other circumstance (prior to the 1921 Kemper Map) surrounding the administrator's sale. And, it is suggested, if the principle of proportionate deduction is followed upon finding a deficiency of land on the ground in the southern tier to fill the quantity calls of the lots there located, it is difficult to understand why the equivalent principle of proportionate distribution should not be followed so as to distribute among the lots on the northern tier the slight surplus of land found there.
In our opinion, the ambiguity resulting from the difficulty of placing lots 38 through 40 cannot, in the absence of any such shown intent, be explained to the purchasers' prejudice (as it was by the Kemper map), by creating an additional lot by withholding two arpents each from Lots 18 through 40 as described by the administrator's deed, and by thus considering this withheld arpentage, set aside as an additional lot, as unsold in the administrator's sale and therefore retained by the sellers. Such ambiguity must rather be resolved in favor of the purchasers and against the sellers. LSACivil Code, Article 2474.
The plaintiffs do not rely upon prescriptive title, it should be added. The only attempted physical possession by them (or their ancestors) occurred for about eight *535 years following 1929, when one of the plaintiffs occasionally cut firewood and hunted on the Ida Mestayer Estate 40.43acre lot as shown by the Kemper Map. Tr. 14:718, 719. Some of the plaintiffs also paid taxes upon the lot when it was, for the first time, put upon the assessment rolls after the Assessor's Office had obtained the use of the Kemper Ownership Plat of 1921. Such claims to title were apparently asserted as a result of the Kemper Map's showing that there was a small tract still belonging to the Mestayer Estate.
As we have earlier stated, title to realty cannot be acquired by estoppel. The recorded dates and acts of possession in accordance with the lot divisions reflected by the Kemper Map, all following its availability in 1921, cannot be considered as establishing the intention of the parties to the administrator's deed some thirty-odd years earlier, at least insofar as showing that some of the estate property had not been sold. This is especially true when all pertinent evidence of the practical construction of the deed between 1888 and 1921 reflects an interpretation by which the Mestayer estate had sold all of the land to which it had record title when the administrator's sale took place in 1888.
As our learned trial brother concluded, in disposing of the contention that the Kemper Ownership Map furnishes a sound guide to the subsequent practical construction of the Administrator's deed, Tr. 10:140:
"* * * the alleged acts of interpretation by the successors in title of the original owners of said lots only date back to about the year, 1921, while the sale itself was made over thirty (30) years theretofore. It is also quite evident that the acts of these successors in title relied upon to prove the alleged construction of said sale were brought about by a false conception of the true meaning and effect which should be given to the administrator's sale. This false conception arose from an ownership map made by Mr. Walter Y. Kemper for the Police Jury of Iberia Parish (Duhe Exhibit 86 in Vol. 9). This map under the circumstances of this case has no probative value and is useful only to explain why some of the parties to this litigation fell into error in their transactions affecting the land involved in this suit, and particularly, the tract of land shown on said map as `Est. Ida Mestayer 40.43'. * * *"
Having concluded that the plaintiffs have failed to carry their burden of proving that they have title to any of the Mestayer estate lands, it is unnecessary to discuss certain other questions raised by the pleadings (such as the alternative Duhe-Sealy plea of thirty years' acquisitive prescription of the land claimed on the southern tier), which we do not reach, since they do not arise unless the plaintiffs have title to all or some of the land claimed. The affirmance of the dismissal of the plaintiffs' suit disposes also of the appeal by Texaco, intervener as mineral lessee of some of the plaintiffs, since the intervener's demand for recognition of its mineral lease is dependent upon a recognition of the plaintiffs' title to part of the land claimed by their suit.

VIII. Appeals by Certain of the Defendants.
In addition to the appeals of the plaintiffs and the intervenor, the Duhe-Sealy group of defendants took a limited appeal; and Walter Delahoussaye, a nominal defendant, also appealed insofar as the trial court had refused to recognize a contract by which some of the plaintiffs and defendants had allegedly conveyed to him a one-half interest in some of the land which is the subject of this suit. As to these appeals by these defendants:
(1) By reconventional demand the Duhe-Sealy defendants had asserted title to part of the property possessed by the Carpenter defendants (who form part of the SCCM group). These co-defendants then filed an *536 exception of no cause of action to this reconventional demand, arguing that Louisiana procedure does not permit cross-claims between co-defendants in petitory actions, since in such suits ordinarily any defendant's title is not at issue until after the plaintiff has made out his own valid title. Before the trial on the merits, the trial court sustained the exception and dismissed the reconventional demand.
However, when the trial court judgment was rendered following trial on the merits, it dismissed the Duhe-Sealy claim against its co-defendants "with prejudice", instead of "without prejudice", even though the reconventional demand had been dismissed for procedural reasons and not as a result of a hearing on the merits. The Duhe-Sealy defendants took a limited appeal in order to secure the amendment of the judgment so as to recognize the dismissal of their reconventional demand as being without prejudice.
In this court, however, the Duhe-Sealy group has presented a motion to dismiss such appeal, stating that since perfection of the appeal the trial court has voluntarily corrected the judgment so as to show that the Duhe-Sealy claim against the Carpenter interests was dismissed "without prejudice", as originally intended. Counsel for each group of defendants in the SCCM group have formally stipulated that these parties do not object to the granting of the Duhe-Sealy defendants' motion to dismiss their own appeal. The plaintiffs-appellants, however, have formally opposed the motion to dismiss the appeal because, it is suggested, the trial court has no power after perfection of the appeal to modify a judgment or to amend it at any time so as to alter its substance. LSA-C.C.P. Arts. 1951, 2088.
By joint motion by all interested parties to it an appeal may be summarily dismissed under the rules of this court. Rule VII, Section 3, 8 LSA-R.S. The plaintiffs are not interested parties in the limited appeal taken by the Duhe-Sealy defendants from the dismissal with prejudice of the latters' reconventional demand against the Carpenter co-defendants. The plaintiffs are not themselves concerned in this petitory action as to whether, as between the defendants, one or the other has title to the property claimed; the dismissal or nondismissal of the Duhe-Sealy claim against the Carpenters has no effect upon the assertion of the plaintiffs' claim against the Duhe-Sealy and/or the Carpenter defendants.
We therefore grant the motion of the Duhe-Sealy defendants to dismiss their own appeal, since they are joined in their motion by, as to it, all other interested parties.
(2) Walter Delahoussaye, a nominal defendant, also appealed. (Emma Delahoussaye Doerle, represented by the same counsel, joins in his appeal.) By his answer to the plaintiffs' petition, Delahoussaye had asserted title to one-half of the interest of certain of both the plaintiffs and defendants in sixty acres of the former Mestayer estate lands claimed by the plaintiffs' suit. Delahoussaye's pleaded claim of title was based upon a 1922 conveyance or contract to such alleged effect. Tr. 3:197-198, 207, 210.
Delahoussaye's answer to the plaintiffs' petition may, as against them, be considered a reconventional demand asserting his own acquisition of a one-half interest from any of the plaintiffs and some of the Albert Mestayer defendants, should the plaintiffs be decreed to have title to all or part of the property claimed. In this respect, his appeal did preserve his right to secure a recognition of his interest had this court ruled in favor of the plaintiffs' title; but since the plaintiffs' claim of title is dismissed by this court, it is unnecessary to consider Delahoussaye's reconventional demand against the plaintiffs.
Upon appeal, his able counsel argues also that, even if the defendants prevail, Walter Delahoussaye is entitled to judgment recognizing his interest in the property claimed by his own answer, insofar as the evidence *537 shows that some of the co-defendants (the Albert Mestayer heirs) now possess it as owners and insofar as some of such co-defendants signed the 1922 instrument allegedly conveying one-half their interest in the property described to Walter Delahoussaye.
Walter Delahoussaye's answer asserting title by virtue of the 1922 contract was served only upon the plaintiff's and the intervenor; it was not served upon any of the co-defendants. Tr. 3:209. As against the defendants, Delahoussaye never attempted to assert by reconventional or third-party demand or by intervention or otherwise his claim to title by virtue of the 1922 contract. The trial court never passed upon nor adjudicated such alleged claim of Delahoussaye against the defendants (see Judgment, Tr. 10:109 et seq.) This was undoubtedly because Delahoussaye's claim against the defendants was not raised by the pleadings; if it had been, almost certainly the same exception of no cause would have been filed and sustained as to the attempted assertion by one defendant in a petitory action of a cross-claim against another, as was done in the instance of the Duhe-Sealy cross-claim against the Carpenter co-defendants.
Delahoussaye's appeal does not, therefore, bring before us on appeal a demand against the defendants which his prior pleadings did not assert against them, upon which issue was never joined, and which was never tried or adjudicated in the trial court. See, e. g., Interstate Oil Pipe Line Co. v. Guilbeau, 217 La. 160, 46 So.2d 113; Brewer v. Foshee, 189 La. 220,179 So. 87.
For the foregoing reasons, the trial court judgment is affirmed. The costs of this appeal are taxed one-half to the plaintiffs, one-half to Texaco, Inc., intervenor-appellant.
Affirmed.

On Applications for Rehearing.
En Banc.
PER CURIAM.
Applications for rehearing have been filed by the plaintiffs-appellants (the Mestayer heirs), by the intervenor-appellant (Texaco), and by Walter Delahoussaye, one of the defendants-appellants. All contentions raised have been disposed of in our original opinion, except for the contentions raised for the first time on application for rehearing by some of the plaintiffs-appellants as heirs of Jules Mestayer, one of the twelve children of Francois and Ida Mestayer.
By this contention the Jules Mestayer heirs allege that the court was in error in holding that all of the Ida and Francois Mestayer heirs had authorized and joined in the administrator's sale of November 3, 1888; since Jules Mestayer had died on February 15 of that year. These appellants further urge that although the exhibits show that Jules Mestayer transferred his interest in the estate of his mother, Ida Mayer Mestayer, to another co-heir prior to his death and to this administrator's sale, the deed shows that Jules Mestayer's conveyance did not divest himself of his interest in his father's estate.
From the record, however, we believe that Jules Mestayer completely divested himself of his interest in the entire property which is presently being claimed by his heirs.
On May 23, 1883, Jules Mestayer, appeared in court and stated that Ida Mayer wife of Francois Mestayer died intestate on February 14, 1883 in the parish of Iberia, and that her said husband had died before her. He prayed that an inventory be taken of the succession of Ida Mestayer and that he be appointed administrator of said succession (Vol. 7, p. 26); the court granted his prayer.
On June 7, 1883, at an estimative inventory of the property belonging to the succession of Ida Mestayer, deceased widow of Francois Mestayer, was taken at the instance of Jules Mestayer (Vol. 7, page 30). *538 Gustave Gonsulin and A. Gustave Broussard, appraisers appointed by the court, found the succession's assets to consist of: "* * * One sugar Plantation at `Fausse Point', in this Parish containing about two thousand five hundred arpents, with all improvements thereon, * * *", which included the property later sold at the administrator's sale. It is to be noted that at the instance of Jules Mestayer, the entire Mestayer tract was inventoried in the succession of Ida Mayer Mestayer as property in full ownership of that succession. As a matter of fact, all subsequent proceedings show that the administration of the husband's estate was merged with that of the wife.
By act of sale dated June 1, 1887, (Exhibit SCCM-7) Jules Mestayer conveyed to Adolph Mestayer all of his undivided rights, titles and interest to and into the succession of Ida Mayer Mestayer. The evident intent of the sale, in the light of the other proceedings and exhibits in evidence, was to convey the entire interest of Jules Mestayer in all property inventoried in the succession of Ida Mayer Mestayer, including the entire community interest of both husband and wife. His heirs therefore have no claim to any of the property here in controversy.
Having come to this conclusion, it is unnecessary to discuss the substantial alternative contention of the defendants-appellees thateven if Jules Mestayer had not conveyed to his co-heir his interest in his father's as well as his mother's succession, and assuming arguendo that the successions had not been merged, then they have lost their right to claim an interest in Jules Mestayer's father's estate by the failure for over thirty years of Jules or his heirs to accept the "Francois Mestayer Succession". See LSA-Civil Code Article 1030; Sun Oil Co. v. Tarver, 219 La. 103, 52 So.2d 437.
The applications for rehearing are denied.
Applications denied.
NOTES
[1] See Exhibit Munson 2, showing acreage of 1835.60 acres between western end of estate tract and the north-south section line at Sections 28-27 and 33-34; plus 81.12 acres between such section line and the Pharr line (see allegation 10 of plaintiffs' petition). By another measurement, the estate land west of the Marshfield Canal is shown to be 959.36 acres, Exhibit Munson No. 2; while the estate land east thereof is shown to be 983.52 acres by survey of Fenstermaker, Tr. 13:328 (who places the outside lines slightly differently); so that by this total there would be a total of 1942.88 acres available to satisfy the total quantity calls of the deed, plus the roads and canals described as located within the tract.
[2] In the proces verbal of the administrator's sale Lots 38, 39, and 40 are described as follows:

"Lot No. 38 of said Plat, containing Forty five 24/100 superficial arpents & bounded North by Lot 39, South & West by Roads and East by Lot 40"
"Lot No. 39 of said plat, containing Forty seven 78/100 superficial arpents bounded North by Mestayer & South by Lot 38"
"Lot No. 40 of said plat, containing Forty-seven 78/100 arpents & bounded North & East by Swamp or Lake, South by E. A. Pharr & West by Lot 38" (As corrected, Tr. Vol. 13.542.)
[3] Although this is true in the case of Lot 36, Lot 37 is described as "bounded North and West by Roads, South by Lot 36, and West by E. A. Pharr". Analyzing this description in conjunction with that of Lot 36, the District Court concluded that the call of "West by E. A. Pharr" was a clerical error and that Pharr was the intended eastern boundary of Lot 37.